STATE OF NORTH CAROLINA v. JAMES DAVID RICH

No. 384A95

(Filed 9 May 1997)

### 1. Constitutional Law § 264 (NCI4th)— announcement of ruling—absence of defendant and attorney—no violation of right to counsel

A superior court judge's announcement in open court of his ruling on the State's request for release of defendant's prison records to the State was not a hearing, and the absence of defendant and his counsel when the announcement was made did not violate defendant's Sixth Amendment right to counsel, where the attorneys for both sides had been heard twice in separate pretrial hearings on this issue.

**Am Jur 2d, Criminal Law §§ 743 et seq., 972 et seq.**

### 2. Constitutional Law § 343 (NCI4th)— announcement of ruling—no right of defendant to be present

A defendant charged with a capital first-degree murder did not have a right under Art. I, § 23 of the N.C. Constitution to be present when a superior court judge announced in open court his ruling on the State's request for release of defendant's prison records to the State after pretrial hearings on the issue had been held with defendant and his counsel both present. Assuming *arguendo* that defendant should have been present for this ruling, his absence was harmless error since the judge had already decided the issue and was merely announcing his ruling.

**Am Jur 2d, Criminal Law §§ 695, 696, 910 et seq.**

### 3. Constitutional Law § 161 (NCI4th)— opportunity to be heard before final ruling—statement by judge—failure to comply—no due process violation

The trial judge did not violate defendant's due process rights by his failure to comply with his statement that defendant would have an opportunity to be heard prior to any final ruling on disclosure of his prison records to the prosecution where defendant and his attorneys were on notice that the State had subpoenaed the prison records and twice had the opportunity to be heard about the release of those records; they knew that disclosure to

STATE v. RICH

[346 N.C. 50 (1997)]

the State was a possibility; and the trial judge's failure to carry out his commitment was inadvertent and harmless.

**Am Jur 2d, Criminal Law §§ 996, 997.**

**4. Criminal Law §§ 179, 205 (NCI4th Rev.)— incompetency to waive counsel or proceed—appointment of mental health expert**

If a defendant demonstrates or if matters before the trial court indicate that there is a significant possibility that a defendant is incompetent to waive counsel or to proceed to trial, the trial court must appoint an expert or experts to inquire into defendant's mental health in accord with N.C.G.S. § 15A-1002(b)(1).

**Am Jur 2d, Criminal Law §§ 95 et seq.**

**5. Criminal Law §§ 179, 205 (NCI4th Rev.)— waiver of counsel—failure to have mental evaluation of defendant**

The trial court did not err by allowing defendant to waive counsel and proceed *pro se* in a capital trial without having defendant evaluated by a mental health professional where there was nothing in the record tending to indicate that defendant was incompetent to waive his right to counsel or to proceed *pro se*; defendant was adamant and unequivocal about not wanting a mental health examination and insisted that he would not cooperate with a psychiatrist; and the trial court elicited the required information from defendant which was sufficient for the court to determine that defendant's decision was knowing and voluntary. N.C.G.S. § 15A-1242.

**Am Jur 2d, Criminal Law §§ 95 et seq.**

**6. Criminal Law § 1346 (NCI4th Rev.)— capital sentencing—two aggravating circumstances—failure to instruct not to use same evidence—not plain error**

The trial court did not commit plain error by failing to instruct the jury in a capital sentencing proceeding that it could not consider the same evidence to find the aggravating circumstances that the murder was committed by a person lawfully incarcerated and that defendant had been previously convicted of a felony involving the use or threat of violence to the person where the evidence showed that defendant had been convicted of shooting into an occupied vehicle and of second-degree murder

and was serving a life sentence for the second-degree murder when he killed the victim in this case; there was separate and independent evidence to support each of the aggravating circumstances; the aggravating circumstances were not interdependent; and there was no reasonable basis for suspicion that the jury used the evidence of defendant's prior convictions as evidence that he was incarcerated at the time of this killing.

**Am Jur 2d, Trial §§ 1441 et seq.**

7. **Criminal Law § 692 (NCI4th Rev.)— capital sentencing—mitigating circumstances—peremptory instructions not required**

The trial court did not err by refusing to give peremptory instructions on the (f)(2) emotional disturbance and the (f)(6) impaired capacity mitigating circumstances in a capital sentencing proceeding where testimony by defendant's psychiatrist tended to show that defendant had a learning disability, attention deficit hyperactivity disorder, and mixed personality disorder, but the existence of these mitigating circumstances was negated by evidence of actions and statements by defendant tending to show that this murder was deliberated and carefully planned and that defendant was fully capable of appreciating the criminality of his conduct. N.C.G.S. § 15A-2000(f)(2), (f)(6).

**Am Jur 2d, Trial § 1021.**

8. **Criminal Law § 1402 (NCI4th Rev.)— killing of another inmate—death penalty not disproportionate**

A sentence of death imposed upon defendant for first-degree murder was not excessive or disproportionate to the penalty imposed in similar cases where defendant pled guilty to first-degree murder; defendant was serving a life sentence for second-degree murder at the time he committed this murder of another inmate, and the jury found the (e)(1) aggravating circumstance that the murder was committed by a lawfully incarcerated person; and defendant killed the victim because he knew that such action would get him transferred from the Eastern Correction Center to Central Prison where he wanted to be.

**Am Jur 2d, Criminal Law § 628.**

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death entered by Stephens (Ronald L.),

**STATE v. RICH**

[346 N.C. 50 (1997)]

J., on 28 August 1995, in Superior Court, Greene County, upon a plea of guilty of first-degree murder. Heard in the Supreme Court 12 February 1997.

*Michael F. Easley, Attorney General, by Mary D. Winstead, Assistant Attorney General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by Marshall Dayan, Assistant Appellate Defender, for defendant-appellant.*

*James D. Rich, defendant-appellant, pro se.*

MITCHELL, Chief Justice.

Defendant James David Rich was indicted on 31 October 1994 for the first-degree murder of Paul Sanford Gwyn. On 27 March 1995, defendant asked to proceed *pro se.* On 15 May 1995, Judge James Llewellyn allowed the request but appointed standby trial counsel. On 15 August 1995, defendant entered a plea of guilty to first-degree murder. After a capital sentencing proceeding, the jury recommended a sentence of death, and the trial court sentenced defendant accordingly.

The State's evidence tended to show, *inter alia,* that on 8 August 1994, Paul Gwyn, an inmate at the Eastern Correctional Center in Maury, North Carolina, was stabbed to death by defendant, also an inmate. Gregory Bagley, another inmate, witnessed both the killing and the events leading up to the killing. Bagley testified that on the day of the killing, he, defendant, and a number of other inmates were in the prison yard. He also stated that defendant had been offering to "put a hit" on someone because defendant did not want to stay at the Eastern prison facility. Bagley explained that, in prison jargon, to "hit" means to kill or hurt someone. Bagley further stated that defendant started a conversation with the victim and demanded defendant's money. The victim responded that he did not know what defendant was talking about and that he did not have defendant's money. Bagley stated that defendant pulled a knife out of his pants and said, "I'll kill you." The victim then ran from defendant, and defendant chased the victim. Bagley ran behind them and watched defendant stab the victim at least twice in the back.

Troy Covington, a correctional officer, testified that after he was advised of the disturbance, he came upon defendant, who was still holding the knife, in the prison yard. Covington took custody of

defendant and the knife. Special Agent Alan McMahan of the State Bureau of Investigation (SBI) testified that he advised defendant of his *Miranda* rights, which defendant waived, and then interviewed defendant concerning his involvement in the stabbing of Paul Gwyn. During the interview, defendant confessed that he intended to kill and did stab and kill the victim.

Defendant testified at his capital sentencing proceeding that he was frustrated by the mandatory schooling program at Eastern and decided that he would do something in order to get away from the facility. He said that he considered several plans and ultimately decided that he was going to kill someone. Defendant said that he decided on three potential victims that he considered "unworthy of living" and finally focused on the victim.

[1] By his first assignment of error, defendant argues that the trial court erred when, on 29 March 1995, it conducted what defendant contends was a pretrial hearing in the absence of both defendant and defense counsel. During a pretrial hearing held in open court 2 February 1995, Judge Herbert Phillips announced that another pretrial hearing would be scheduled for 10 February 1995. Prior to the conclusion of the 2 February hearing, the State asked Judge Phillips to sign a subpoena for defendant's prison records, and defendant objected. Judge Phillips ordered defendant's prison records to be sent to the judge presiding at the next hearing in this case. The next pretrial hearing was held on 9 February 1995 before Judge William Griffin, Jr., pursuant to Rule 24 of the General Rules of Practice for the Superior and District Courts. The purpose of a Rule 24 hearing is to determine pretrial matters in capital cases. At the 9 February hearing, the State again moved for defendant's prison records. The defense objected and moved to quash the subpoena on the ground that the records were confidential. Judge Griffin decided to review the records *in camera* to determine which materials, if any, should be divulged to the State. Judge Griffin also stated that he would not immediately release the records to the State without giving the defense an opportunity to be heard.

On 29 March 1995, Judge Griffin announced his ruling from the bench in open court. Neither defendant nor defense counsel was present. Defendant contends that this was a hearing at which he was entitled to be present and heard prior to the release of any of his prison records to the State. Defendant argues that the trial court violated his rights under the Sixth and Fourteenth Amendments to the

**STATE v. RICH**

[346 N.C. 50 (1997)]

United States Constitution and Article I, Sections 18, 19, and 23 of the North Carolina Constitution and that this unfairly prejudiced him in this case. We disagree.

Prior to announcing his ruling on 29 March, Judge Griffin referred to the previously held Rule 24 hearing and underscored the fact that defense counsel, defendant, and the State had been present at that hearing. Judge Griffin stated:

> All of them were present. And everybody agreed that I should take these records and review them and see if it was appropriate to release them to Mr. Jacobs [prosecutor] based upon his subpoena to Mr. Barnett [superintendent of prison records] for those records. I have completed my review of those records a month ago; however, I've been in court so much and out of the office so much I haven't had a chance to dictate an order.

Judge Griffin then announced his ruling as follows:

> I, today, have prepared an order. I'll file it. Basically what I'm going to do is tell [the prosecutor] and [defense counsel] I'm going to seal one complete copy for the appellate courts. I have redacted from the second copy thirteen pages that I think it would be inappropriate for [the prosecutor] to receive at this time.
>
> I think, under the statute, G.S. 148-76, [the prosecutor] is entitled to his prison records; however, these thirteen pages relate to matters that might interfere with the defendant's defense in the case. I'm going to seal those thirteen pages in a separate envelope subject to review by the appellate courts or further orders of the court. [The prosecutor] is entitled to those records at some later time during the proceedings.
>
> I'm going to deliver a copy of those thirteen pages to [defense counsel]. The remaining part of the court's second set of those prison records, I'll deliver to [the prosecutor].

Defendant's contention that his right to counsel was violated is misplaced. The United States Supreme Court has held that an accused has the right to counsel "at any stage of the prosecution . . . where counsel's absence might derogate from the accused's right to a fair trial." *United States v. Wade,* 388 U.S. 218, 226, 18 L. Ed. 2d 1149, 1157 (1967). We conclude that Judge Griffin's announcement of his ruling in open court cannot reasonably be characterized as a hear-

ing, much less one at which defendant's presence was required. Judge Griffin simply took a final step in the process of deciding whether to release any part of defendant's prison records to the prosecution and announced his decision from the bench. Moreover, prior to Judge Griffin's ruling, this issue had been raised twice and attorneys for both sides had been heard twice in separate pretrial hearings. The proceeding during which Judge Griffin announced his ruling was not a hearing, and we conclude that his announcement of his ruling in the absence of defendant and his counsel did not violate defendant's Sixth Amendment right to counsel.

[2] We further disagree with defendant's contention that he had a right under the North Carolina Constitution to be present when Judge Griffin announced his ruling on this matter. The Confrontation Clause in Article I, Section 23 of the North Carolina Constitution "guarantees an accused the right to be present in person at every stage of his trial." *State v. Payne*, 320 N.C. 138, 139, 357 S.E.2d 612, 612 (1987). However, this right is limited to capital cases and "does not arise prior to the commencement of trial." *State v. Chapman*, 342 N.C. 330, 338, 464 S.E.2d 661, 665 (1995), *cert. denied*, —— U.S. ——, 135 L. Ed. 2d 1077 (1996). Although a better practice in this case may have been for the judge to have summoned defendant and defense counsel prior to announcing his final ruling, we find no error. Moreover, assuming *arguendo* that defendant should have been present for this ruling, his presence would have served no purpose. Judge Griffin had already decided the issue before him and was merely announcing his ruling. Thus, defendant's absence was harmless beyond a reasonable doubt.

[3] Defendant further contends that the trial court violated his right to due process by promising defendant that he would have an opportunity to be heard prior to any final ruling on disclosure of his prison records. In support of this contention, defendant cites *Lankford v. Idaho*, 500 U.S. 110, 114 L. Ed. 2d 173 (1991), wherein the defendant was misled by the trial court into believing that he could not receive the death penalty. We find this case to be inapposite. In *Lankford*, the Supreme Court found the trial court's imposition of the death penalty under such circumstances fundamentally unfair. The Court found that lack of adequate notice to defendant that the trial court was considering imposing the death penalty "created an impermissible risk that the adversary process may have malfunctioned in this case." *Id.* at 127, 114 L. Ed. 2d at 188-89. In *Lankford*, the defendant's attorney lacked notice that the death penalty was a sentencing option for her

**STATE v. RICH**

[346 N.C. 50 (1997)]

client and thus did not raise several important issues in his defense. Thus, in *Lankford*, the defendant was prejudiced.

In the instant case, however, defendant and his attorneys were on notice that the State had subpoenaed the prison records and twice had the opportunity to be heard about the release of these records. They knew that disclosure to the State was a possibility. Although, as a general rule, trial judges should not fail to carry out commitments made to defendants, we believe that the failure here was inadvertent and harmless. We conclude that the announcement of the ruling was not an additional hearing and did not constitute a denial of defendant's due process rights.

Defendant also contends that he was prejudiced by the release of these records. However, defendant has not indicated how the release of his prison records to the prosecution, with a portion redacted by the trial court in order to protect defendant's rights, improperly or unfairly prejudiced him in this case. This assignment of error is overruled.

By another assignment of error, defendant argues that it was error to allow defendant to represent himself without having defendant evaluated by a mental health professional. Defendant contends that a good-faith doubt as to his competence to proceed and his ability to knowingly and intelligently waive his rights to trial and counsel were raised twice in this case. He argues that the trial court abused its discretion by not ordering a mental health evaluation of defendant and that defendant is therefore entitled to a new trial. We disagree.

The transcript reveals that during a hearing held 15 May 1995, defendant appeared before Judge James Llewellyn and stated that he wanted to have his appointed counsel removed from his case. Judge Llewellyn responded that before he would consider entering an order to remove appointed counsel, he would want to have defendant evaluated to determine his competence both to stand trial and to represent himself. Judge Llewellyn thus admonished defendant:

Now my personal advice to you is this: Let's go ahead and get the [mental health] evaluation and after we get that evaluation then I can more intelligently make a decision about what to do in regard to your request to fire these two lawyers.

But the people that are going to be trying this case against you have been trained in every facet of first degree murder capital cases, they know the rules of evidence, they know the motions

to file, they know the orders to comply with, and how to select juries, how not to pick jurors, and I assume that you don't know how to do that.

Now, you may think you do. But I've been doing this for twenty-seven years and I've never seen a layperson that could keep up with what goes on in a capital murder case.

Defendant reiterated his displeasure with appointed counsel and stated:

But as far as a mental health evaluation, I'll waive that. I don't even want it. They didn't give me no mental health evaluation in 1990—in 1990 when I caught this life sentence I'm doing now.

Again Judge Llewellyn admonished defendant that he was going to order him to be evaluated by a psychiatrist at Dorothea Dix Hospital. Defendant stated:

It's like this, Your Honor, I'm not going to cooperate with—I'm going to cooperate with them, and I'm not going to Dorothea Dix, and I'm not going to let no doctor come up here to evaluate me. That's—that's out. And I've got that right to choose that no matter what you, or the D.A., or anybody else says. I've got that right and it can't be violated.

Defendant continued, reiterating the fact that he was not going to cooperate with any doctors and that there was "nothing wrong with my head and I will not go to Dorothea Dix Hospital." He further stated that he knew he faced a possibility of receiving the death penalty and understood the consequences. Judge Llewellyn interjected and asked, "Are you telling me you don't want a lawyer period?" Defendant responded, "I don't want a lawyer period."

Judge Llewellyn asked defendant three more times if he wanted a lawyer, and each time, defendant responded that he did not. Judge Llewellyn then stated:

And even if I ordered you to go to Dorothea Dix, you're not going to go, and if they make you go, you're not going to cooperate with them; is that what you're telling me?

Defendant responded:

Yeah. I'm not going to cooperate with nobody concerning this case, Your Honor, you, or the District Attorney, or my counselors, or whatever, I'm—I'm, you know, I've had it. And it's disgusted

me—I've been disgusted with it three months ago when I figured that they would have it in—they'd have it getting ready to be tried.

And yet, I've still got to wait until August at the earliest to get tried over a simple prison killing.

And further more, there's nobody—nobody's got—there ain't nobody—nobody can judge me. I've got my own mind, and my own way of thinking, and it's not going to change. It is not going to change.

At this point, Judge Llewellyn asked defendant his age and the highest grade he had completed in school. Defendant responded that he was twenty-three and that he had completed the eighth grade. Judge Llewellyn then asked defendant if he could read and write, and defendant answered that he could. Judge Llewellyn then removed defendant's appointed counselors, stating:

The court is of the opinion the defendant is competent to stand trial, although I question his ability to represent himself, he is adamant in that, and that he doesn't want any lawyer of any kind from anywhere to represent him. He wants to represent himself and he will be allowed to do that.

I'm not going to make him go to Dorothea Dix because he's told me he wouldn't go and if he went he wouldn't cooperate with the physicians there.

At this point, defendant stated that he would sign a waiver to the effect that he did not want to be represented by counsel. Ultimately, defendant did so, and Judge Llewellyn signed the certificate. On 21 June 1995, Judge Llewellyn entered an order appointing standby trial counsel.

Defendant's decision to represent himself was revisited during trial proceedings by Judge Ronald Stephens on 14 August 1995. On that date, defendant's standby counsel moved for the court to find defendant incompetent to waive counsel and requested that the trial court review defendant's mental health records. After reviewing these records and those previously sealed by Judge Griffin, Judge Stephens questioned defendant about his decision not to cooperate with a psychiatrist. Defendant responded that he had "strongly considered" the matter and that he had personal reasons for not doing so. Judge Stephens then proceeded to explain to defendant in detail

the capital sentencing procedure, each step of the way asking defendant if he understood. After explaining the process, Judge Stephens asked defendant if he had any questions, and defendant replied, "No, your honor. I fully understand." At the conclusion of this hearing, Judge Stephens entered an order memorializing the fact that defendant, with the help of standby counsel, was representing himself.

On 15 August 1995, Judge Stephens again engaged defendant in extensive colloquy regarding his decision to plead guilty, making every effort to ensure that defendant's choice was knowing and intelligent. The discussion proceeded as follows:

THE COURT: You understand that at least along life's way sometimes we vacillate on what we want to do from time to time, but if the court decides that you have now made your mind up that this is the best way for you to proceed and the court accepts your plea, then once that's done, it's done? And I'm not going to do this unless I'm satisfied that you're satisfied that this is what you want to do. Once you've made that decision, an hour or two from now, we cannot undo that decision.

[DEFENDANT]: Yes, sir.

THE COURT: And so the decision that you make once the court decides—and if the court decides that it is a willing and knowing decision on your part, once that has in fact been done, there will be no return to that?

[DEFENDANT]: Yes, sir.

THE COURT: Do you understand that, sir?

[DEFENDANT]: That's right.

THE COURT: Do you feel like that you need any additional time to either think about it or discuss it with [defense counsel] or take any additional time in consideration of what your decision is this morning?

[DEFENDANT]: No, your honor. I don't need any more time.

At this point, Judge Stephens accepted defendant's guilty plea.

A trial court may order a mental health evaluation of a defendant when that defendant's capacity to proceed is questioned. N.C.G.S. § 15A-1002(b)(1) (1988). The trial court has the power on its own motion to order such an evaluation as part of an inquiry into the

defendant's capacity to proceed. *State v. Heptinstall*, 309 N.C. 231, 235, 306 S.E.2d 109, 112 (1983). In fact, under some circumstances, a trial court may have a constitutional duty to make such an inquiry and to require such an evaluation. *Id.* at 235-36, 306 S.E. 2d at 112. However, this case reveals no such circumstances.

**[4]** In deciding this issue, it is helpful to look to the United States Supreme Court's decision in *Ake v. Oklahoma*, 470 U.S. 68, 84 L. Ed. 2d 53 (1985). In *Ake*, the Court held that when a defendant demonstrates that his sanity at the time of the offense is likely to be a significant factor at trial, a state is required to provide the defendant with psychiatric assistance in preparing for trial. *Id.* at 83, 84 L. Ed. 2d at 66. However, the burden is on the defendant in such situations to make an initial showing that a psychiatric evaluation would disclose a mental condition likely to be a significant factor at trial. *Id.* Although *Ake* dealt with appointment of an expert to help the defendant prepare and present evidence of his insanity at the time of the crime charged, we conclude that a similar rule must be applied in determining whether a trial court has erred in failing to appoint an expert to inquire into a defendant's capacity to waive counsel or to proceed to trial with or without counsel. If a defendant demonstrates or if matters before the trial court indicate that there is a significant possibility that a defendant is incompetent to waive counsel or to proceed to trial, the trial court must appoint an expert or experts to inquire into the defendant's mental health in accord with N.C.G.S. § 15A-1002(b)(1).

**[5]** Defendant points to nothing in the record in the present case, however, tending to indicate that he was incompetent to waive his right to counsel, to plead guilty, or to proceed *pro se*. There is evidence in the record, however, that points to defendant's competency to do all three of these things. On 14 August 1995, the date trial proceedings began, defendant's standby counsel addressed Judge Stephens as follows:

> I will say what I have told [defendant], that the discussions that I've had with him have been positive. I've had no problem in discussing matters with him and I don't feel like he's had any problems discussing matters with me.

After reviewing the record, we find that defendant was adamant and unequivocal about not wanting a mental health examination; he insisted that he would not cooperate with a psychiatrist and that sending him to Dorothea Dix would be a waste of time. In the

absence of any evidence suggesting that defendant may have been incompetent, we conclude that the trial court did not err in deciding not to order the evaluation.

We also conclude that the trial court properly granted defendant's request to proceed *pro se* and honored that decision throughout the proceedings. A criminal defendant has the right to represent himself provided he makes this decision knowingly and intelligently. *Faretta v. California*, 422 U.S. 806, 835, 45 L. Ed. 2d 562, 581 (1975). N.C.G.S. § 15A-1242 sets forth the duties of the trial court in determining the validity of a defendant's waiver of his right to counsel and decision to proceed *pro se*. Under the statute, a trial court must conduct an inquiry thorough enough to satisfy itself that the defendant

(1) [h]as been clearly advised of his right to the assistance of counsel, including his right to the assignment of counsel when he is so entitled;

(2) [u]nderstands and appreciates the consequences of this decision; and

(3) [c]omprehends the nature of the charges and proceedings and the range of possible punishments.

N.C.G.S. § 15A-1242 (1988). In *State v. Thomas*, 331 N.C. 671, 673, 417 S.E.2d 473, 475 (1992), we held that before a defendant may be permitted to waive appointed counsel, the trial court is constitutionally required to determine two things. First, the court must determine that defendant "clearly and unequivocally" waived his right to counsel and elected to proceed *pro se*. *Id.* Second, it must determine whether defendant knowingly, intelligently, and voluntarily waived his right to in-court representation. *Id.* at 674, 417 S.E.2d at 476; *accord State v. Carter*, 338 N.C. 569, 581, 451 S.E.2d 157, 163 (1994), *cert. denied*, ——— U.S. ———, 132 L. Ed. 2d 263 (1995).

After carefully reviewing the transcript, we conclude that the trial court in this case "elicited the required information" from defendant and that this information was "sufficient for [it] to determine that defendant's decision was both knowing and voluntary." *Carter*, 338 N.C. at 583, 451 S.E.2d at 164. We take this opportunity to reiterate that so long as a trial court follows these guidelines in determining the validity of a defendant's waiver of his right to counsel, this Court will esteem that defendant's right to proceed *pro se*. As the Supreme Court stated in *Faretta*, "although [a defendant] may conduct his own defense ultimately to his own detriment, his choice

must be honored out of 'that respect for the individual which is the life-blood of the law.' " *Faretta*, 422 U.S. at 834, 45 L. Ed. 2d at 581 (quoting *Illinois v. Allen*, 397 U.S. 337, 350-51, 25 L. Ed. 2d 353, 363 (1970) (Brennan, J., concurring)). We conclude that the trial court below did not err in deciding not to order a psychiatric evaluation of defendant or in allowing defendant to waive counsel and to proceed *pro se*. This assignment of error is overruled.

**[6]** By another assignment of error, defendant argues that the trial court erred by failing to instruct the jury during the capital sentencing proceeding that it could not consider the same evidence to find two submitted aggravating circumstances. The two aggravating circumstances relied upon by the State were that the capital felony was committed by a person lawfully incarcerated, N.C.G.S. § 15A-2000(e)(1) (1988) (amended 1994), and that defendant had been previously convicted of a felony involving the use or threat of violence to the person, N.C.G.S. § 15A-2000(e)(3). During the capital sentencing proceeding, the State presented evidence that defendant had been convicted of shooting into an occupied vehicle in 1988 and of second-degree murder in 1990. Further, defendant was serving a life sentence for the 1990 murder when he killed the victim in this case. Defendant and standby counsel raised objections to the presentation of this evidence to support the two statutory aggravating circumstances. However, neither defendant nor standby counsel requested the limiting instruction to which defendant now claims he was entitled.

In *State v. Rouse*, 339 N.C. 59, 451 S.E.2d 543 (1994), *cert. denied*, —— U.S. ——, 133 L. Ed. 2d 60 (1995), the defendant argued that it was error for the trial court to fail to give the same limiting instruction defendant requests here. However, as here, the defendant in *Rouse* failed to request the instruction at trial. We therefore concluded in that case that our review must be limited to one for plain error. *Id.* at 99, 451 S.E.2d at 565. In the instant case, we must accordingly limit our review to determining if the trial court committed plain error in failing to give a limiting instruction when it submitted these two aggravating circumstances. We conclude that it did not.

Defendant does not contend that the evidence to support the two aggravators overlapped, and indeed, he acknowledges that there was separate and independent evidence to support both the (e)(1) and the (e)(3) aggravating circumstances. Instead, he argues that the jurors could have used the same evidence to support the two aggravating circumstances, in violation of the law.

Defendant is correct that the trial court may not submit two aggravating circumstances when each circumstance is supported only by the evidence supporting the other. *State v. Gay*, 334 N.C. 467, 495, 434 S.E.2d 840, 856 (1993). "However, where there is separate evidence to support each aggravating circumstance, it is not improper for both of the circumstances to be submitted even though the evidence supporting each may overlap. The trial court should nonetheless instruct the jury in such a way as to ensure that jurors will not use the same evidence to find more than one aggravating circumstance." *Id.* (citation omitted).

In the present case, separate evidence supported each of the aggravating circumstances. Therefore, the trial court properly submitted both aggravating circumstances for consideration by the jury. Further, we see no reasonable basis for suspicion that the jury used the evidence of defendant's prior convictions as evidence that he was incarcerated at the time of this killing. There was direct evidence that defendant was lawfully incarcerated at the time of the killing; whether he was incarcerated for a crime of violence was irrelevant in determining that the (e)(1) aggravator existed. Moreover, the fact that defendant was incarcerated for the specific crime of second-degree murder was not integral to finding the (e)(1) circumstance. In order to establish that aggravator, the State needed only to prove that the defendant was lawfully in prison within the meaning of N.C.G.S. § 15A-2000(e)(1). To establish the (e)(3) aggravator, on the other hand, it was irrelevant whether defendant was or ever had been incarcerated; the State merely had to show that he had previously been convicted of any crime involving the use or threat of violence.

In order to establish plain error, a defendant must "show that the error was so fundamental that another result would probably have obtained absent the error." *Rouse*, 339 N.C. at 99, 451 S.E.2d at 565. Given the fact that there was independent evidence supporting each aggravating circumstance, the fact that the aggravating circumstances were not interdependent, and the fact that defendant did not think it necessary to request a limiting instruction at sentencing, we conclude that it is unlikely any possible error affected the outcome. This assignment of error is overruled.

[7] By another assignment of error, defendant argues that the trial court erred in denying him peremptory instructions on the (f)(2) and (f)(6) statutory mitigating circumstances. These mitigators are, respectively, that the capital felony was committed while defendant was under the influence of a mental or emotional disturbance and

that defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired. N.C.G.S. § 15A-2000(f)(2), (6). Defendant contends that the testimony of his psychiatric expert established that defendant committed the murder while he was under the influence of a mental or emotional disturbance and that he lacked the capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law. Therefore, defendant argues, it was error for the trial court to deny defendant peremptory instructions as to these mitigating circumstances. We disagree.

A peremptory instruction is proper only when all the evidence, if believed, tends to show that the circumstance exists. *State v. Noland*, 312 N.C. 1, 20, 320 S.E.2d 642, 654 (1984), *cert. denied*, 469 U.S. 1230, 84 L. Ed. 2d 369 (1985). "However, a peremptory instruction is inappropriate when the evidence surrounding that issue is conflicting." *Id.*

The testimony of the psychiatrist in the instant case tended to show that defendant had a learning disability, attention deficit hyperactivity disorder, and mixed personality disorder. However, we find plenary evidence tending to negate the (f)(2) statutory mitigating circumstance and tending to show that defendant killed the victim after substantial deliberation. Most illuminating in this regard is the testimony of Alan McMahan, an SBI agent who took a statement from defendant just hours after the killing. Defendant stated that a couple of weeks before the murder, after he was written up for failing to attend class, he would "give them something to write him up for." Defendant admitted that he made the knife he used in the killing "with the intention of killing somebody." He also told McMahan that he had three inmate informants in mind as potential victims and that he had asked his fellow inmates if there was anyone they wanted harmed. Moreover, defendant himself testified at sentencing that in order to get away from the facility at Eastern, he felt he was going to have to kill somebody. He related his thought processes for getting out of Eastern: that a fistfight would only send him to lock-up for a time but would not get him transferred and that a stabbing would earn him only a "little bit worse" punishment. Thus, there was substantial evidence to indicate that this murder was deliberated and carefully planned. Accordingly, we conclude that the trial court properly denied defendant's request for a peremptory instruction as to the (f)(2) mitigating circumstance, that he killed while under the influence of a mental or emotional disturbance.

As to the (f)(6) mitigating circumstance, defendant's statement and actions tend to show that he was fully able to appreciate the criminality of his conduct. Following his apprehension by a prison official just after the murder, defendant stated that he was in prison for murder and that he guessed that he was going to "smell gas this time." The prison officer noted that defendant appeared to know where he was and what he had done. In light of the overwhelming evidence in this case which contradicted the opinion of defendant's psychiatric expert, we conclude that the trial court properly denied the peremptory instruction as to this mitigating circumstance. This assignment of error is overruled.

## PRESERVATION ISSUES

Defendant also raises for "preservation" the following three issues: (1) the trial court improperly instructed the jury on nonstatutory mitigating circumstances, (2) the trial court improperly instructed the jury on sentencing Issues Three and Four regarding consideration of proven mitigation, and (3) the trial court improperly instructed the jury regarding the meaning of a life sentence. We have previously considered and rejected defendant's arguments on these issues and find no compelling reason to depart from our prior holdings. Therefore, we overrule each of these assignments of error.

## PROPORTIONALITY REVIEW

[8] We now turn to our statutory duty as codified in N.C.G.S. § 15A-2000(d)(2) and reserved exclusively for this Court in capital cases. We must ascertain (1) whether the record supports the jury's findings of the aggravating circumstances on which the sentence of death was based; (2) whether the jury recommended the death sentence under the influence of passion, prejudice, or other arbitrary consideration; and (3) whether the death sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and defendant. N.C.G.S. § 15A-2000(d)(2). After thoroughly examining the record, transcripts, and briefs in this case, we conclude that the evidence fully supports the aggravating circumstances found by the jury. Moreover, the defendant admits that there was independent evidence to support each of them. Further, there is no indication that the sentence of death in this case was imposed under the influence of any arbitrary consideration. We turn then to our final statutory duty of proportionality review.

In the case *sub judice*, defendant pled guilty to first-degree murder. The jury found two aggravating circumstances: that the mur-

der was committed by a person lawfully incarcerated, N.C.G.S. § 15A-2000(e)(1), and that defendant previously had been convicted of the two violent felonies of firing into an occupied motor vehicle and second-degree murder, N.C.G.S. § 15A-2000(e)(3). In mitigation, one or more jurors found the statutory mitigating circumstance that the murder was committed while defendant was mentally or emotionally disturbed, N.C.G.S. § 15A-2000(f)(2), and that defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the law was impaired, N.C.G.S. § 15A-2000(f)(6). Further, the jury found nine of twenty submitted nonstatutory mitigating circumstances.

In conducting our proportionality review, it is appropriate for us to compare the present case with other cases in which this Court has concluded that the death penalty was disproportionate. *State v. McCollum*, 334 N.C. 208, 240, 433 S.E.2d 144, 162 (1993), *cert. denied*, 512 U.S. 1254, 129 L. Ed. 2d 895 (1994). We have found the death penalty disproportionate in seven cases. *State v. Benson*, 323 N.C. 318, 372 S.E.2d 517 (1988); *State v. Stokes*, 319 N.C. 1, 352 S.E.2d 653 (1987); *State v. Rogers*, 316 N.C. 203, 341 S.E.2d 713 (1986), *overruled on other grounds State v. Gaines*, 345 N.C. 647, 483 S.E.2d 396 (1977) WL 174309 (April 1, 1997) *and* by *State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988); *State v. Young*, 312 N.C. 669, 325 S.E.2d 181 (1985); *State v. Hill*, 311 N.C. 465, 319 S.E.2d 163 (1984); *State v. Bondurant*, 309 N.C. 674, 309 S.E.2d 170 (1983); *State v. Jackson*, 309 N.C. 26, 305 S.E.2d 703 (1983).

None of the seven cases in which this Court has found the death penalty disproportionate is factually similar to the present case. None of the defendants in those cases had previously been convicted of killing another human being at the time they committed the murders for which they were sentenced to death. Moreover, this is the first appellate case in which a jury has found the (e)(1) aggravating circumstance, that the murder was committed by a lawfully incarcerated person. Defendant was serving a life sentence for second-degree murder at the time he committed the murder at issue. By killing a man in prison, defendant has demonstrated that he will not abide the rules and regulations of the most confining punishment society provides and indeed that he is indifferent to them. Defendant has shown himself to be a recidivist murderer while serving a life sentence for murder. The death penalty is not a disproportionate punishment for someone who demonstrates his recidivistic tendencies in this manner.

Defendant has shown a disregard for the value of human life. Most reprehensible, we believe, is defendant's motive, or lack thereof, for the killing. He killed because he knew that such action would get him transferred from the unit at Eastern Correctional Center and into Central Prison, where he wanted to be. Defendant's indifference toward human life tends to show that he is not likely ever to rehabilitate himself. We cannot conclude as a matter of law that the sentence of death is excessive or disproportionate, and we leave it undisturbed.

NO ERROR.