STATE OF NORTH CAROLINA v. LEROY McNEIL

No. 37A87-4

(Filed 20 August 1999)

**1. Sentencing— capital—aggravating circumstances—course of conduct—prior plea agreement**

There was no error in a first-degree murder capital sentencing hearing where defendant contended that a plea agreement in a prior trial for the same offenses resulted in the State being precluded from submitting evidence of another murder in support of the course of conduct aggravating circumstance, in violation of *State v. Case*, 330 N.C. 161. The denial of the State's motion to join the additional murder in the prior trial effectively barred the State from introducing any evidence of that murder and that ruling became the law of the case. The unavailability of the evidence relating to the third murder (Kearney) was not the result of a voluntary plea agreement executed between defendant and the State as in Case and the principles enunciated in Case are not applicable. In any event, by opposing the joinder of Kearney's murder, defendant obtained a benefit which he may not now transform into a claim of error.

**2. Jury— selection—capital sentencing—instructions—failure to request**

During jury selection for a capital first-degree murder sentencing proceeding, defendant waived his contention that refusing to instruct prospective jurors to disregard parole-related considerations was error by not requesting the Conner instruction at any point during the questioning of the prospective jurors. Defendant's argument that his tender of modified jury instructions prior to voir dire was sufficient to constitute a request for the Conner instruction regarding two particular prospective jurors was rejected. Plain error analysis does not apply to situations in which the trial court has failed to give an unrequested instruction regarding jury voir dire.

STATE v. McNEIL

[350 N.C. 657 (1999)]

**3. Jury— selection—parole eligibility—ability to follow instructions**

There was no error during jury selection for a capital sentencing proceeding for first-degree murder where defendant contended that the court erred by not allowing defendant to question prospective jurors as to whether they could follow the trial court's instructions regarding parole eligibility. Upon reviewing the record, the Court concluded that defendant was allowed to ask prospective jurors whether they could follow the court's instruction.

**4. Evidence— capital sentencing proceeding—witness's prior convictions**

There was no prejudicial error during a capital sentencing proceeding for first-degree murder where defendant contended that the Confrontation Clause had been violated by the Court's refusal to allow cross-examination of a State's witness concerning unserved warrants which defendant contended had given the police leverage over the witness during questioning. The court afforded defendant wide latitude to expose the witness's alleged bias and motive by allowing cross-examination regarding all prior convictions, regardless of age; instructed the jury that the witness was testifying under an agreement with the prosecutor for a charge reduction and that the witness was an accomplice considered to have an interest in the outcome of the case; and further cross-examination to show bias or motive would have been repetitive and cumulative. Unlike the cases relied upon by defendant, the issue in this case arose in the context of a sentencing hearing rather than a trial to determine guilt or innocence.

**5. Appeal and Error— preservation of issues—denial of motion in limine**

Defendant in a capital sentencing proceeding waived an assignment of error to testimony regarding autopsy findings where defendant's previous motion in limine had been denied and defendant did not object at the time the State questioned the witness. The denial of defendant's motion in limine is insufficient to preserve for appeal the question of the admissibility of the challenged evidence.

STATE v. McNEIL

[350 N.C. 657 (1999)]

6. Evidence— capital sentencing—prior murder—hearsay—other evidence—no prejudice

There was no prejudicial error in a capital sentencing proceeding for a first-degree murder in the admission of testimony from a retired police officer that defendant had drowned his wife. Defendant opened the door by raising the issue, and, even assuming that the testimony was barred by the Confrontation Clause, the parties had stipulated that defendant had pled guilty to voluntary manslaughter for his wife's death, defendant had received an active prison term for the offense, and a certified copy of the plea and judgment were introduced. Competent evidence was before the jury which supported the submission of the prior violent felony aggravating circumstance.

7. Sentencing— capital—mitigating circumstance—no significant history of prior criminal activity

The trial court did not err in a capital sentencing proceeding for a first-degree murder by not submitting the statutory mitigating circumstance of no significant history of prior criminal activity where the State's evidence revealed a 1959 burglary conviction for which defendant was sentenced to six months probation, defendant later violated his probation, served time in Savannah, Georgia for larceny of a television, was arrested in 1975 for hit and run and property damage, and pled guilty in 1977 to voluntary manslaughter for throwing his wife over a bridge into a lake. None of the cases cited by defendant in which it was held appropriate to submit the circumstance involved a prior criminal history which included a violent felony involving death. N.C.G.S. § 15A-2000(f)(1).

8. Criminal Law— prosecutor's argument—capital sentencing—sympathy for victims

The prosecutor's argument in a capital sentencing proceeding was not so grossly improper as to require the trial court to intervene ex mero motu where defendant contended that the prosecutor placed undue emphasis upon the personal qualities and future prospects of the victims and sought to improperly invoke sympathy for the victims. The prosecutor's argument about the promising nature of the victim's lives served to inform the jury about the specific harm caused by defendant's crime.

STATE v. McNEIL

[350 N.C. 657 (1999)]

### 9. Criminal Law— prosecutor's argument—capital sentencing—prior violent felony

The trial court did not err in a capital sentencing proceeding by not intervening ex mero motu to prevent the prosecutor from referring to another murder where defendant contended that the argument urged the jury to return a death sentence based on the course of conduct aggravating circumstance, N.C.G.S. § 15A-2000(e)(11), which the court had refused to submit to the jury. The additional death was relevant to the prior violent felony aggravating circumstance, N.C.G.S. § 15A-2000(e)(3).

### 10. Criminal Law— prosecutor's argument—capital sentencing—general deterrence

There was no grossly improper error requiring intervention ex mero motu in a capital sentencing proceeding where defendant contended that the prosecutor attempted to defend the death penalty on general deterrence grounds.

### 11. Criminal Law— prosecutor's argument—capital sentencing—community sentiment

There was no error requiring intervention ex mero motu in a capital sentencing proceeding where defendant contended that the prosecutor improperly informed the jury that community sentiment urged the death penalty and that the jury is effectively an arm of the State. It is not improper to remind jurors that they are the voice and conscience of the community.

### 12. Criminal Law— prosecutor's argument—capital sentencing—moral culpability

There was no gross error demanding intervention ex mero motu in a capital sentencing proceeding where defendant contended that the prosecutor repeatedly urged the jury to reject proposed mitigating circumstances based on defendant's failure to demonstrate that he lacked moral culpability, thereby improperly implying that the jury could ignore credible mitigating evidence. The prosecutor's definition and statements concerning defendant's moral culpability were substantially similar to those found in the North Carolina Pattern Jury Instructions and upheld in other cases.

**13. Criminal Law— prosecutor's argument—capital sentencing—lack of due process for victims**

There was no gross error requiring intervention ex mero motu in a capital sentencing proceeding where the prosecutor argued that defendant took victims' lives without due process. It has been repeatedly held that it is not improper to argue that defendant acted as judge, jury, and executioner to single-handedly decide the victim's fate.

**14. Criminal Law— prosecutor's argument—capital sentencing—facts in evidence**

There was no gross error requiring intervention ex mero motu in a capital sentencing proceeding for first-degree murder where defendant contended that the prosecutor either materially misstated the evidence or based his argument on facts not in evidence. The argument at issue concerned fingerprints and the record revealed that defendant had stipulated to his guilty plea in a prior voluntary manslaughter. It can be reasonably inferred that defendant was fingerprinted after his arrest for this crime and that law enforcement used defendant's fingerprints from their files in the investigation of these deaths; in any event, the trial court properly instructed the jurors that they were the sole judge of the evidence and should be guided by their own recollection of the evidence rather than counsel's arguments.

**15. Sentencing— capital—aggravating circumstances—voluntary manslaughter as prior violent felony—instructions**

There was no error in a capital sentencing proceeding for first-degree murder where the trial court instructed the jury with respect to the prior violent felony aggravating circumstance that voluntary manslaughter is by definition a felony involving the use or threat of violence to the person. N.C.G.S. § 15A-2000(e)(3).

**16. Sentencing— capital—aggravating circumstances—prior violent felony—instructions**

There was no plain error in a capital sentencing proceeding where defendant contended that the court improperly charged the jury in connection with the prior violent felony aggravating circumstance that defendant had engaged in some acts of violence against his wife at or prior to her death (not the subject of this sentencing proceeding). The record shows within the meaning and intent of N.C.G.S. § 15A-2000(e)(3) that defendant used

STATE v. McNEIL

[350 N.C. 657 (1999)]

violence or the threat of violence to throw his wife over a bridge into a lake while she was still alive.

**17. Sentencing— capital—aggravating circumstances—especially heinous, atrocious or cruel—instructions**

The trial court did not err in a capital sentencing proceeding by giving almost verbatim the North Carolina Pattern Jury Instruction on the especially heinous, atrocious or cruel aggravating circumstance, N.C.G.S. § 15A-2000(e)(9). Although defendant contended that the instructions impermissibly allowed the jury to find the existence of this aggravating circumstance based upon the combined actions of defendant and an accomplice, defendant admitted that he planned to kill one victim so that there would be no witnesses, further admitted shooting that victim, and pled guilty to her murder. *Enmund v. Florida*, 458 U.S. 782, has no application to the facts at hand.

**18. Sentencing— capital—aggravating circumstances—especially heinous, atrocious or cruel—sufficiency of evidence**

There was sufficient evidence in a capital sentencing proceeding to warrant submission of the especially heinous, atrocious, or cruel aggravating circumstance despite defendant's contention that the instructions allowed the jury to find the circumstance based on an accomplice's behavior. The detailed evidence clearly showed that defendant murdered a victim and was an active participant in severely beating and strangling her prior to her death.

**19. Trials— instructions—request following charge**

A defendant in a capital sentencing procedure waived an objection to the court's exclusion of evidence of organic brain damage from its instructions on the mental or emotional disturbance mitigating circumstance by failing to make a timely request to include evidence of organic brain damage when specifically asked by the court at the charge conference. Once the jury has been charged, a defendant is not permitted to propose new evidentiary matter if he previously had the opportunity to raise any such argument at the charge conference. Rule 21 of the General Rules of Practice for Superior and District Courts.

**20. Sentencing— capital—death sentence—not arbitrary**

The evidence in a capital sentencing proceeding in which the jury returned a death penalty fully supported the aggravating cir-

cumstances found by the jury and there was no indication that the death sentence was imposed under the influence of passion, prejudice, or any other arbitrary consideration.

**21. Sentencing— capital—proportionality**

A death sentence was not substantially similar to any of the cases in which a death penalty was found disproportionate and had the characteristics of first-degree murders for which the death penalty has previously been upheld as proportionate. The defendant in this case admitted murdering two victims, pleading guilty to their premeditated and deliberate first-degree murder. He planned to rob and kill one victim, deceived her to get her alone in a vacant house and then brutally tortured and murdered her; he planned to rob and kill the second victim two days later, luring her to go drinking, driving her to an isolated area, shooting her in the head and leaving her body on the side of the road, and then going to her apartment and stealing belongings; and the jury found four statutory aggravating circumstances in the first murder and three in the second. A death sentence has never been found disproportionate where defendant was convicted of murdering more than one victim, three of the four aggravating circumstances found in the first murder have been found sufficient standing alone to sustain a death sentence, two of the three aggravating circumstances found in the second murder have been found sufficient to sustain a death sentence standing alone, and a death sentence has never been found disproportionate in a witness elimination case.

Appeal of right pursuant to N.C.G.S. § 7A-27(a) from judgments imposing sentences of death entered by Farmer, J., on 14 November 1996 in Superior Court, Wake County upon defendant's plea of guilty to two counts of first-degree murder. Heard in the Supreme Court 13 April 1999.

*Michael F. Easley, Attorney General, by G. Patrick Murphy, Special Deputy Attorney General, for the State.*

*Sam J. Ervin, IV, for defendant-appellant.*

MARTIN, Justice.

On 9 May 1983 defendant Leroy McNeil (defendant) was indicted for the first-degree murders of Deborah Jean Fore (Fore), Elizabeth Faye Stallings (Stallings), and Irene Dina Kearney (Kearney). At the

26 March 1984 Criminal Session of Superior Court, Wake County, Judge Coy E. Brewer granted the State's motion to join the Fore and Stallings murders but denied the State's motion to join the Kearney murder. On 9 May 1984 the jury convicted defendant of the first-degree murders of Fore and Stallings on the basis of malice, premeditation and deliberation, and the felony murder rule. Following a capital sentencing proceeding, the jury recommended a sentence of death in each case, and, on 14 May 1984, the trial court entered judgments in accordance with those recommendations. Thereafter, the State voluntarily dismissed the murder charge against defendant for the Kearney murder.

On appeal, this Court found no error in defendant's first-degree murder convictions and death sentences. *State v. McNeil*, 324 N.C. 33, 375 S.E.2d 909 (1989). On 26 March 1990 the United States Supreme Court granted defendant's petition for a writ of certiorari and remanded defendant's case to this Court for reconsideration in light of *McKoy v. North Carolina*, 494 U.S. 433, 108 L. Ed. 2d 369 (1990). *McNeil v. North Carolina*, 494 U.S. 1050, 108 L. Ed. 2d 756 (1990). On remand, this Court vacated defendant's death sentence and remanded to the trial court for resentencing. *State v. McNeil*, 327 N.C. 388, 395 S.E.2d 106 (1990), *cert. denied*, 499 U.S. 942, 113 L. Ed. 2d 459 (1991).

Prior to his resentencing, defendant filed a motion for appropriate relief claiming trial counsel admitted his guilt to the jury without defendant's consent in violation of *State v. Harbison*, 315 N.C. 175, 337 S.E.2d 504 (1985), *cert. denied*, 476 U.S. 1123, 90 L. Ed. 2d 672 (1986). On 26 August 1993 Judge Jack A. Thompson allowed defendant's motion and awarded him a new trial.

On 28 October 1996 defendant entered a plea of guilty to the first-degree murders of Fore and Stallings. On 14 November 1996 the jury again recommended a sentence of death in each case. On 14 November 1996 the trial court entered judgments in accordance with the jury's recommendations.

The State's evidence at the second trial, introduced during the sentencing hearing, tended to show the following. On Friday, 8 April 1983, defendant and Penny McNeil (Penny) discussed committing a robbery to obtain money. While discussing their robbery plans, defendant told Penny that if they did not kill the witnesses they might be able to identify defendant and Penny. Defendant and Penny

decided that "what ever take place on that will just have to take place."

While driving through Raleigh that afternoon, defendant and Penny saw Stallings and asked her if she wanted a ride. Stallings accepted. Defendant and Penny drove Stallings to pick up food stamps at the United States Post Office on New Bern Avenue. When Stallings was in the post office, defendant told Penny to move to the back seat so he could "check [Stallings] out and see if she had any money."

When Stallings returned to the car, defendant drove to a store to retrieve a change purse Penny had left in a phone booth. While they were in the store, defendant told Penny he was going to rob Stallings.

After leaving the store, defendant asked Stallings "did she smoke Reefer," and "where she could get some." Defendant and Penny drove Stallings to a vacant house next door to defendant's residence. Defendant and Penny tricked Stallings into believing the vacant house was a place to purchase drugs. Defendant, Penny, and Stallings entered the vacant house. At some point, Penny removed a pocketknife from defendant's car and brought it into the vacant house.

After entering the house, defendant "acted like he was going to . . . kiss the young lady" and "forced her into the back bedroom," where "he grabbed her around the neck," pulled out his knife, and demanded her money and food stamps. Stallings gave defendant and Penny her food stamps and begged them not to hurt her. Defendant forced Stallings to pull up her top to see if she had any money, which she did not. Penny noticed that Stallings had been cut and was bleeding from her chest. Defendant began strangling Stallings and told Penny he was trying "to get her weak" but that he was not going to kill her. Penny testified that "[i]t looked to me like he was trying to kill her, because her eyes were rolling back and her tongue was coming out of her mouth."

Defendant told Penny to go next door and get his gun. When Penny returned with defendant's M1.22 rifle, Stallings "was laid out in the floor" and appeared to be dead. Defendant told Penny to leave the room, and, after doing so, defendant shot Stallings. Defendant then removed Stallings' clothes to make it appear as if she had been raped. Defendant and Penny left Stallings' body in a closet of the vacant

home. Defendant sold Stallings' food stamps for $109.00 and used the money to purchase alcoholic beverages.

Dr. Gordon LeGrand, the pathologist at Wake Medical Center who performed the autopsy on Stallings' body, testified that Stallings died as a result of a bullet wound to her head.

On Saturday, 9 April 1983, the next day, defendant and Penny spent most of the day drinking. They continued drinking until Sunday, 10 April 1983, when they realized their rent was due and they had "rode around and drinked up the money." Defendant and Penny discussed various people they might rob and the prospect of Penny engaging in prostitution to get the rent money. Defendant told Penny that Fore might have money, but since Fore knew defendant, he would have to kill Fore after the robbery in order not to leave any witnesses.

Defendant called Fore on the phone and talked with her about going out for a beer. Fore refused defendant's offer but defendant told Fore he would come to her apartment anyway. Defendant and Penny went to Fore's apartment, and Fore again refused to go out with defendant but agreed to let him drive her to a local store. Instead of driving to the store, defendant drove to a club located on Rock Quarry Road where Penny was going to pretend to look for her boyfriend. The club was closed so defendant proceeded back toward Rock Quarry Road and stopped the car in an isolated area. Defendant took a .22-caliber-long barrel pistol from under the seat and put it in his belt and stepped out of the car. Fore got out of the car and told defendant, "you could have had me to the store and back home and now we got a flat tire." While Penny sat in the car, defendant shot Fore in the head, took her keys and a dollar bill, and left her body on the side of the road.

Defendant and Penny traveled to Fore's apartment, used Fore's key to get inside, and stole her pocketbook, a jewelry box, and a television set. After stealing Fore's pocketbook, defendant attempted to use her bank card. After several unsuccessful tries, the automated teller machine retained the bank card. Fore's pocketbook was later dropped in a well behind defendant's residence and the pistol and rifle used in the two murders were sold for $90.00.

Dr. Laurin Kaasa, the pathologist at Wake Medical Center who performed the autopsy on Fore's body, stated that Fore died as a result of a gunshot wound to her head.

**STATE v. McNEIL**

[350 N.C. 657 (1999)]

During the sentencing proceeding, defendant introduced several witnesses who testified that defendant was born into extreme poverty and was subject to severe physical and mental cruelty by his grandfather and that defendant grew up in an environment where the most basic needs were not adequately met. Defendant also introduced testimony of three correctional officers, all of whom testified that defendant was an excellent worker with a positive attitude. Defendant further introduced the testimony of Dr. Robert Theodore Michael Phillips, a psychiatrist. Dr. Phillips testified that defendant had become grossly desensitized to human interaction and showed signs of organic brain dysfunction, alcoholism, and a personality disorder not otherwise specified.

Additional facts will be provided as needed to discuss specific issues pertaining to defendant's assignments of error.

## PLEA AGREEMENT

[1] By assignment of error, defendant contends that his plea agreement improperly precluded the State from submitting evidence of the Kearney murder in support of the (e)(11) statutory aggravating circumstance. The plea agreement states "that upon defendant's pleas of guilty the State will not seek to charge defendant with any additional conduct now known to the State" and "the State will not seek to introduce any evidence in this case relating to the Irene Kearney [murder]."

In seeking to have all three cases joined for trial, the State argued that after murdering Stallings and Fore on 8 and 10 April 1983, respectively, defendant and Penny met Kearney at a liquor house, "lure[d] her to their house," "lured [her] behind the house," and killed her on 15 April 1983. Defendant contends that the State's evidence shows defendant murdered Kearney using similar *modus operandi* and during the same time frame as the Stallings and Fore murders. Defendant asserts this evidence is relevant to the (e)(11) statutory aggravating circumstance: "The murder for which the defendant stands convicted was part of a course of conduct in which the defendant engaged and which included the commission by the defendant of other crimes of violence against another person or persons." N.C.G.S. § 15A-2000(e)(11) (1997). By failing to submit evidence of Kearney's murder in support of the (e)(11) statutory aggravating circumstance, defendant argues the trial court violated *State v. Case*, 330 N.C. 161, 410 S.E.2d 57 (1991).

**STATE v. McNEIL**

[350 N.C. 657 (1999)]

In *Case* the State agreed it would only offer evidence of the (e)(9) statutory aggravating circumstance—the murder was especially heinous, atrocious, or cruel—as part of a plea bargain in which defendant agreed to plead guilty to first-degree murder. N.C.G.S. § 15A-2000(e)(9); *Case*, 330 N.C. at 163, 410 S.E.2d at 58. The evidence, however, would have supported submission of the (e)(5) statutory aggravating circumstance—defendant committed the murder while engaged in the commission of a kidnapping—and the (e)(6) statutory aggravating circumstance—defendant committed the murder for pecuniary gain. N.C.G.S. § 15A-2000(e)(5), (6); *Case*, 330 N.C. at 163, 410 S.E.2d at 58.

This Court concluded that "[i]t was error for the State to agree not to submit aggravating circumstances which could be supported by the evidence." *Case*, 330 N.C. at 163, 410 S.E.2d at 58. We reasoned that:

[i]f our law permitted the district attorney to exercise discretion as to when an aggravating circumstance supported by the evidence would or would not be submitted, our death penalty scheme would be arbitrary and, therefore, unconstitutional. Where there is no evidence of an aggravating circumstance, the prosecutor may so announce, but this announcement must be based upon a genuine lack of evidence of any aggravating circumstance.

*Id.*

Defendant properly asserts that the State lacks the authority to agree not to submit statutory aggravating circumstances which could be supported by evidence. *Id.*; *see State v. Atkins*, 349 N.C. 62, 76, 505 S.E.2d 97, 106 (1998), *cert. denied,* —— U.S. ——, —— L. Ed. 2d ——, 67 U.S.L.W. 3732 (1999); *State v. Adams*, 347 N.C. 48, 57, 490 S.E.2d 220, 224 (1997), *cert. denied,* 522 U.S. 1096, 139 L. Ed. 2d 878 (1998); *State v. Johnson*, 331 N.C. 660, 665, 417 S.E.2d 483, 486 (1992). In the present case, however, the State did not have evidence available supporting a statutory aggravating circumstance related to Kearney's murder because the trial court severed the case.

On 25 January 1984 the State filed a motion to join all three murder cases for trial. Defendant filed a motion opposing joinder of the cases because there was "no transactional connection or continuing program of action with regard to the three murders." After providing opportunity for both parties to be heard, Judge Brewer granted the

State's motion to join the Stallings and Fore murders, but denied the State's motion to join the Kearney murder. Judge Brewer's ruling effectively barred the State from introducing any evidence of Kearney's murder during defendant's 1984 trial for the Stallings and Fore murders.

At defendant's second trial, defendant, by and through his counsel, conceded that matters resolved by Judge Brewer were "law of the case." Defendant stated:

> [W]e stood before Your Honor [Judge Farmer] the first day that this trial began and I had a list of motions on behalf of the defendant to present to the Court, and the State said, Your Honor, we believe these matters are resolved by law of the case, a Superior Court Judge has previously considered these matters and this is the law of the case, which I think he's right about that.

Because a previous court ruling barred the joinder of Kearney's murder, no evidence of Kearney's murder was introduced by the State at defendant's second sentencing hearing. The unavailability of evidence relating to Kearney's murder was not the result of a voluntary plea agreement executed between defendant and the State, as in *Case*. Rather, it was the result of the trial court's prior judicial order barring the joinder of Kearney's murder. Consequently, the principles enunciated in *Case* are not applicable to the instant proceeding.

In any event, by opposing the joinder of Kearney's murder, defendant obtained a benefit which now, on appellate review, he claims was unlawful and requires a new trial. "A defendant is not prejudiced by the granting of relief which he has sought or by error resulting from his own conduct." N.C.G.S. § 15A-1443(c) (1997). Defendant may not transform the trial court's earlier favorable ruling into a claim the trial court erred by accepting a plea agreement which only assured the State would comply with the trial court's earlier ruling severing Kearney's murder case. This assignment of error is without merit.

## JURY SELECTION

[2] In his next assignment of error, defendant contends the trial court erred by refusing to instruct prospective jurors to disregard parole-related considerations in determining defendant's sentence. We disagree.

STATE v. McNEIL

[350 N.C. 657 (1999)]

When instructing the jury about parole eligibility, this Court has previously held that the trial court's instructions should provide, in substance,

> that the question of eligibility for parole is not a proper matter for the jury to consider and that it should be eliminated entirely from their consideration and dismissed from their minds; that in considering whether they should recommend life imprisonment, it is their duty to determine the question as though life imprisonment means exactly what the statute says: 'imprisonment for life in the State's prison.'

*State v. Conner*, 241 N.C. 468, 471-72, 85 S.E.2d 584, 587 (1955).

In the present case, the record reveals that prior to the beginning of *voir dire*, defendant submitted two requests for modified jury instructions to be given "[i]n the event that during selection of the jury one of the jurors should express in the presence of other jurors" some difficulty with the belief that a life sentence means a life sentence. The trial court denied defendant's request, stating, "I plan to give the standard answer if they raise the question of parole, which comes out of Supreme Court case [law]."

During *voir dire* of the first panel of twelve jurors, defendant engaged prospective juror Britt in the following dialogue:

Q: Ms. Britt, let me come back to you and ask you, is there anything about a sentence of life in prison that particularly gives you concern? I don't think I had an opportunity yesterday to ask you that specific question. Is there anything about a life sentence that troubles you?

A: No, as long as it is a life sentence and, without the opportunity of parole.

Q: Yes, ma'am. Talk to me about that, if you will?

MR. MURPHY [prosecutor]: Objection, Your Honor.

COURT: Well, sustained to the form of the question.

Q: You indicated that there is one feature of a life sentence that troubles you. Can you tell me what it is about that that troubles you?

MR. MURPHY: Objection, Your Honor.

COURT: Well, overruled.

Q: You can answer the question, Ms. Britt?

A: It would bother me if someone were given a life sentence and then two or three years later was allowed out again.

Q: Yes, ma'am. Is there any other feature about a life sentence that would trouble you or is that the only one?

A: That's mainly it, or I would say the only one.

Following further questioning of prospective juror Britt, the trial court held two bench conferences. Following the second bench conference, defendant continued questioning prospective jurors and participated in the following dialogue with prospective juror Turner:

Q: Is there anything about a life sentence that is troublesome to you as you now sit in the courtroom, thinking about it, that you need to tell me?

A: Well, I have concerns, like Ms. Britt, wouldn't want a life sentence to be, you know, wouldn't want somebody to be paroled in two or three years that's connected to a life sentence, sentenced to a life sentence.

Q: Yes, ma'am. You would want it to be real life?

A: Yes, sir.

At the conclusion of the proceedings on that day, the trial court allowed defendant to reconstruct the earlier bench conferences held during prospective juror Britt's questioning. Defendant requested the opportunity to ask prospective juror Britt, "If in this case, if [the] Court instructs you that a life sentence means the defendant will spend the rest of his life in prison, will you have any difficulty following that instruction?" The trial court told defendant that if this question was asked and the State objected, the objection would be sustained. Alternatively, defendant requested the opportunity to read the tendered jury instructions to the prospective jurors. Defendant further requested permission to ask the jurors if they could follow the law with respect to parole eligibility. Defendant's requests were denied.

Later, during defendant's *voir dire* of prospective juror Johnson, the following conversation occurred:

Q: Do you have any feelings about a life sentence that you want to tell me?

A: Yes, I do.

Q: Tell me about that?

A: One of the biggest things I have about a life sentence is the literal interpretation of life. The second thing is parole, which goes right along with the first thing. If we're talking a true life, what lifetime are we talking about? And those—so I have a problem with that.

Q: Yes, sir. Excuse me just a moment.

After a bench conference and a short recess, the trial court discussed the instructions to be given to prospective jurors regarding parole eligibility. Defendant stated, "unless the Court will tell this jury that, something to the effect, they're to consider a life sentence means life, we can't then ask if the two jurors [Britt and Taylor] that specifically raised this issue whether they'll have any difficulty following that instruction." The trial court responded by stating that it did not believe an inquiry as to whether "life meant life" amounted to a request for parole instructions in accordance with *Conner*. The trial court further stated that it could instruct a prospective juror as to what life imprisonment means. Nonetheless, if a prospective juror asked about parole, the trial court would respond by reciting the *Conner* instruction. In addition, the trial court stated that because prospective jurors Britt and Taylor did not inquire as to whether defendant might be paroled, there was no need to give the *Conner* instruction. The trial court also stated that, generally, when a prospective juror raises a parole eligibility issue, "most of the attorneys turn to the Court and say, we'll let the Court answer that, but nobody has asked me to do that." In response, defendant requested that the trial court give the *Conner* instruction to prospective juror Johnson. Additionally, defendant again requested that the trial court read the tendered jury instructions to the prospective jurors. The trial court denied defendant's request to read the tendered instructions but agreed to read the *Conner* instruction.

When the prospective jurors returned and *voir dire* continued, the trial court gave the *Conner* instruction as follows:

COURT: Members of the jury, I believe that one or two, perhaps two of the jurors have already made an inquiry of counsel

which they can not answer to the jury, and that is concerning life imprisonment, what that means. Somebody may have raised the question of parole, one of the jurors after that.

Our Supreme Court here in North Carolina has anticipated that some jurors may raise that question or make that inquiry of the Court. And when that question comes up, and if it's in your minds at this point, the Court would like to say to you that the question of any eligibility for parole is not a proper matter for you to consider in recommending punishment in this case, and it should be eliminated entirely from your consideration and dismissed from your minds. In considering whether to recommend death or life imprisonment in this case, you should determine the question as though life imprisonment means exactly what the statute says, imprisonment for life. You may continue with your questions.

Defendant then asked the prospective jurors whether they could follow the *Conner* instruction and received affirmative responses.

At the conclusion of the jury selection process, the issue arose again during questioning by defendant:

Q: Have any of my questions to other prospective jurors brought to mind any point that any of you would like to make before we finish this questioning, that is, is there anything troubling you, concerning you that you believe that we should go into before we stop?

A: (Juror Number 3) I have one question. In the State of North Carolina when you say life imprisonment, what exactly does that entail? In some states that means life without parole. Could you please expand on that as a sentencing option?

Q. Mr. Mangin, I'm going to ask the Court to answer that question for you.

The trial court answered prospective juror Mangin's question by reciting the same *Conner* instruction. The prospective juror responded, "That answers my question." Following this exchange, defendant did not again attempt to question prospective jurors concerning their ability to follow the *Conner* instruction.

In the case at hand, defendant argues the submission of the tendered jury instructions prior to *voir dire* constituted a request for

the *Conner* instruction during questioning of prospective jurors Britt and Turner.

A defendant's eligibility for parole is not a proper matter for consideration by a jury during sentencing. *State v. White*, 343 N.C. 378, 389, 471 S.E.2d 593, 599, *cert. denied*, 519 U.S. 936, 136 L. Ed. 2d 229 (1996); *State v. Robbins*, 319 N.C. 465, 518, 356 S.E.2d 279, 310, *cert. denied*, 484 U.S. 918, 98 L. Ed. 2d 226 (1987); *State v. Jones*, 296 N.C. 495, 502-03, 251 S.E.2d 425, 429 (1979). "[A] jury may be instructed about the question of parole and meaning of life imprisonment, if such question arises during jury deliberation. However, we have not held that a jury should be instructed upon these issues absent such an inquiry." *State v. Skipper*, 337 N.C. 1, 43, 446 S.E.2d 252, 275 (1994), *cert. denied*, 513 U.S. 1134, 130 L. Ed. 2d 895 (1995) (citing *State v. Robinson*, 336 N.C. 78, 123-24, 443 S.E.2d 306, 329 (1994), *cert. denied*, 513 U.S. 1089, 130 L. Ed. 2d 650 (1995)). "[A]lthough we have approved the inclusion of the language 'life means life' in instructions to the jury in response to inquiries by the jurors about the meaning of a life sentence during their sentencing deliberations, *we have not required it.*" *State v. Burr*, 341 N.C. 263, 288, 461 S.E.2d 602, 615 (1995) (emphasis added), *cert. denied*, 517 U.S. 1123, 134 L. Ed. 2d 526 (1996); *see State v. Campbell*, 340 N.C. 612, 632, 460 S.E.2d 144, 154-55 (1995), *cert. denied*, 516 U.S. 1128, 133 L. Ed. 2d 871 (1996).

In *Atkins*, 349 N.C. 62, 505 S.E.2d 97, a case factually similar to the one at hand, defendant argued that the trial court committed plain error by failing to instruct the jury not to consider parole in its decision in accordance with *Conner*. *Id.* at 81, 505 S.E.2d at 109. "During *voir dire*, a prospective alternate juror expressed concern about his ability to make a sentencing decision based only upon the facts and the law unless he could be assured that a life sentence included a stipulation that there could be no parole." *Id.* On appeal, defendant argued that the discussion between the prospective juror and the trial court in the presence of the other jurors triggered a duty for the trial court to give a "life means life" instruction. *Id.*

Finding defendant's assignment of error without merit, this Court concluded:

Defendant's failure to raise this issue constitutes waiver under Rule 10(b)(2). This Court has applied the plain error analysis only to instructions to the jury and evidentiary matters. We decline to extend application of the plain error doctrine to situations in

which the trial court has failed to give an instruction during jury *voir dire* which has not been requested.

*Id.* at 81, 505 S.E.2d at 109-10.

The facts in *Atkins* are analogous to the situation presented before this Court. Defendant did not request that the trial court give the *Conner* instruction at any point during the questioning of prospective jurors Britt or Turner. In fact, only during the *voir dire* of prospective juror Johnson did defendant finally request the *Conner* instruction. The trial court granted defendant's request and noted that this was the first time defendant had requested the *Conner* instruction. We do not agree with defendant's argument that his tender of modified jury instructions prior to *voir dire* was sufficient to constitute a request for the *Conner* instruction during questioning of prospective jurors Britt and Turner. Accordingly, defendant's claim related to prospective jurors Britt and Turner has been waived. *See* N.C. R. App. P. 10(b)(2). Additionally, plain error analysis does not apply "to situations in which the trial court has failed to give an instruction during jury *voir dire* which has not been requested." *Atkins,* 349 N.C. at 81, 505 S.E.2d at 109-10.

[3] Defendant further argues that the trial court erred by failing to allow defendant to ask prospective jurors whether they could follow the trial court's instructions regarding parole eligibility. Once the trial court instructs the jury in accordance with *Conner,* "[t]he defendant has a right to inquire as to whether a prospective juror will follow the court's instruction." *State v. Jones,* 336 N.C. 229, 240, 443 S.E.2d 48, 52, *cert. denied,* 513 U.S. 1003, 130 L. Ed. 2d 423 (1994).

Upon review of the record, we conclude that defendant was allowed to ask prospective jurors whether they could follow the trial court's instruction regarding parole eligibility. After the trial court first gave the *Conner* instruction, defendant was afforded the opportunity to ask the prospective jurors whether they could follow the instruction:

Q. Can you—did you understand the Court's instruction and can you follow that instruction if you're chosen to serve as a juror in this case?

A. [Juror Johnson] I comprehend the Court's instruction.

Defendant asked the other prospective jurors who were present the same question, and all responded affirmatively. In addition, at the

conclusion of *voir dire*, the trial court again gave the *Conner* instruction after prospective juror Mangin asked a question regarding parole eligibility. At this time, defendant had the opportunity but failed to ask any of the prospective jurors whether they could follow the trial court's instructions.

By allowing defendant to inquire as to whether the prospective jurors could follow the court's instructions, the trial court properly followed *Jones*, 336 N.C. 229, 443 S.E.2d 48. Defendant's assignment of error is rejected.

## CAPITAL SENTENCING

[4] By another assignment of error, defendant contends the trial court committed prejudicial error by refusing to allow defendant to cross-examine Penny concerning any unserved warrants against her for felonious assault.

Prior to the evidentiary portion of defendant's sentencing hearing, the State filed a motion *in limine* seeking "to prohibit the defendant from asking the State's witness Penn[y] McNeil about any criminal convictions which are more than ten years old" and to prohibit defendant "from asking about any specific instances of conduct of the witness Penn[y] McNeil as any prior specific instances of conduct have not been shown to be probative of truthfulness or untruthfulness." Defendant responded that he intended "to offer evidence of and go into the witness Penny McNeil's prior history of convictions and actions that appear on her criminal record, some of which did not result in convictions," for the purpose of showing bias and motive. Defendant further replied that Penny's knowledge of any unserved warrants gave her a motive to cooperate with the police and to minimize the extent of her own involvement in the Stallings and Fore murders. The trial court ruled that defendant could discuss all of Penny's prior convictions, regardless of their age, but would take under advisement the issue of questioning Penny about specific instances of conduct not probative of truthfulness or untruthfulness.

During defendant's cross-examination of Penny, the trial court sustained the State's objection to a question asking Penny if "at the time this happened, there was an outstanding warrant for your arrest?"

Defendant argues that Penny, at the time she was questioned by police, was aware of the existence of at least one, and possibly two, outstanding warrants for felonious assault with a deadly weapon

STATE v. McNEIL

[350 N.C. 657 (1999)]

inflicting serious bodily injury. Defendant also contends the police were aware of Penny's unserved warrants, and thus, had great leverage over Penny during questioning. Consequently, by not allowing defendant to inquire about Penny's outstanding warrants, defendant claims the trial court violated his rights under the Confrontation Clause of the Sixth Amendment to the United States Constitution and Article I, Section 23 of the North Carolina Constitution.

The State contends that defendant's proposed cross-examination was repetitive and cumulative of other cross-examination reflecting on Penny's alleged bias, and, in addition, that any such error was harmless beyond a reasonable doubt.

The Confrontation Clause guarantees the right of an accused in a criminal prosecution to be confronted with the witnesses against him. "Generally speaking, the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer*, 474 U.S. 15, 20, 88 L. Ed. 2d 15, 19 (1985) (per curiam).

> It does not follow, of course, that the Confrontation Clause of the Sixth Amendment prevents a trial judge from imposing any limits on defense counsel's inquiry into the potential bias of a prosecution witness. On the contrary, trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.

*Delaware v. Van Arsdall*, 475 U.S. 673, 679, 89 L. Ed. 2d 674, 683 (1986). Accordingly, cross-examination guaranteed by the Confrontation Clause is "[s]ubject always to the broad discretion of a trial judge to preclude repetitive and unduly harassing interrogation." *Davis v. Alaska*, 415 U.S. 308, 316, 39 L. Ed. 2d 347, 353 (1974).

During the sentencing hearing, the trial court afforded defendant wide latitude to expose Penny's alleged bias and motive by allowing cross-examination regarding all of Penny's prior convictions, regardless of age. On cross-examination, defendant questioned Penny about her prior criminal history of convictions, including assault with a deadly weapon on Gloria Davis, assault and battery on Polly Liles, assault with a deadly weapon in 1977, assault on Sharon Randolph in

1979, assault on David Bridges in 1980, and damage to property in 1978. Testimony was further elicited by the State that Penny had entered into a plea agreement which allowed her to avoid the death penalty and receive a sentence of life plus ten years in exchange for her truthful testimony. Penny and the prosecutor both stated for the record that the plea agreement signed by Penny was the only agreement any prosecutorial agency ever made with her. Penny further testified that, even though she did not recall the four to five different stories she told the police, she admitted she lied to the police when she was originally questioned, she was indeed present at Stallings murder, and she did have a knife in her hand during the murder.

Moreover, the trial court instructed the jury that evidence had been introduced which tended to show: (1) Penny "was testifying under an agreement with the prosecutor for a charge reduction and a recommendation for a sentence concession in exchange for her [truthful] testimony"; (2) Penny was an accomplice and "[a]n accomplice is considered by the law to have an interest in the outcome of the case"; and (3) "defendant in this case contends that Penny McNeil made false contradictory or conflicting statements."

Consequently, further cross-examination relating to Penny's unserved assault warrants to show alleged bias or motive would be repetitive and cumulative of the evidence already presented. *See State v. Howie*, 310 N.C. 613, 616, 313 S.E.2d 554, 556 (1984) (excluded evidence of witness' indictment of an unrelated robbery was cumulative because witness' "potential bias was fully explored"). Therefore, we cannot say the trial court abused its discretion in excluding the evidence.

Even assuming, *arguendo*, that the trial court erred in excluding evidence of Penny's unserved assault warrants, we hold any such error was harmless beyond a reasonable doubt. N.C.G.S. § 15A-1443(b); *see Delaware v. Van Arsdall*, 475 U.S. at 684, 89 L. Ed. 2d at 686 (Confrontation Clause violation subject to harmless error analysis); *State v. Hoffman*, 349 N.C. 167, 181, 505 S.E.2d 80, 89 (1998) (same), *cert. denied*, —— U.S. ——, 143 L. Ed. 2d 522 (1999).

In arguing that the trial court was in violation of the Confrontation Clause, defendant relies principally upon *Davis v. Alaska*, 415 U.S. 308, 39 L. Ed. 2d 347, and *State v. Prevatte*, 346 N.C. 162, 484 S.E.2d 377 (1997).

**STATE v. McNEIL**

[350 N.C. 657 (1999)]

In *Davis* the principal witness against defendant was on probation after having been adjudicated a delinquent for burglarizing two cabins. *Davis*, 415 U.S. at 310-11, 39 L. Ed. 2d at 350. The trial court did not allow defendant to cross-examine the witness about his probationary status, and the Court in *Davis* held this violated defendant's Sixth Amendment right "to be confronted by the witnesses against him." *Id.* at 315, 39 L. Ed. 2d at 353.

In *Prevatte* the State's principal witness was under indictment in another county on nine charges of forgery and uttering forged checks. *Prevatte*, 346 N.C. at 163, 484 S.E.2d at 378. The trial court denied defendant's requests to cross-examine the witness about these charges and whether the witness had been promised anything in return for testifying against defendant. *Id.* Relying on *Davis*, this Court held that the refusal of the trial court to allow cross-examination of the State's principal witness was constitutional error warranting a new trial. *Id.* at 163-64, 484 S.E.2d at 378-79.

The State contends the facts in the instant case are more analogous to our recent holding in *Hoffman*, 349 N.C. 167, 505 S.E.2d 80. In *Hoffman* the trial court did not allow defendant to cross-examine Donald Pearson, a State's witness, about charges pending against him for breaking and entering. *Id.* at 179, 505 S.E.2d at 87-88. On appeal, defendant argued this was a violation of his rights under the Sixth Amendment Confrontation Clause. *Id.* at 179, 505 S.E.2d at 88.

The Court in *Hoffman* held that the trial court's error in failing to allow defendant to cross-examine Pearson was harmless beyond a reasonable doubt. *Id.* at 181, 505 S.E.2d at 89. Distinguishing the facts in *Hoffman* from those of *Davis* and *Prevatte*, this Court reasoned that Hoffman was not denied the right of "effective" cross-examination under the Sixth Amendment. *Id.* at 180-81, 505 S.E.2d at 88-89. Pearson's testimony was not central to the defendant's guilt, and thus Pearson was classified not as a principal witness, but as a corroborating witness. *Id.* at 180, 505 S.E.2d at 88. "[E]ven without inquiry into any pending charges, Pearson was thoroughly impeached on cross-examination" about his prior convictions and conduct. *Id.* at 180, 505 S.E.2d at 88-89. "Pearson was also cross-examined about several prior inconsistent statements." *Id.* at 181, 505 S.E.2d at 89. Finally, there was substantial additional evidence and testimony presented by the State demonstrating defendant's guilt aside from Pearson's testimony. *Id.*

We conclude the facts in the present case are more analogous to *Hoffman* than to *Davis* and *Prevatte*. In *Davis* and *Prevatte*, the principal witnesses' testimony was critical in determining defendants' guilt. In the present case, defendant entered guilty pleas to both counts of first-degree murder on the first day of trial. Consequently, the context in which this issue arises is a sentencing hearing, rather than a trial to determine guilt or innocence.

In addition, as in *Hoffman*, defendant here thoroughly impeached Penny regarding her prior inconsistent statements and prior convictions. Penny admitted on direct and on cross-examination that she initially lied to the police during questioning. Furthermore, defendant thoroughly questioned Penny about her prior criminal convictions, regardless of their age. Accordingly, we are inclined to believe that the trial court's exclusion of defendant's proposed cross-examination was well within the "broad discretion of a trial judge to preclude repetitive and unduly harassing interrogation." *Davis*, 415 U.S. at 316, 39 L. Ed. 2d at 353. In any event, it is clear that any error in denying defendant's request to question Penny about her unresolved warrants was harmless beyond a reasonable doubt. *Hoffman*, 349 N.C. at 181, 505 S.E.2d at 89. This assignment of error fails.

**[5]** In defendant's next assignment of error, he argues the trial court erred by allowing the State's pathologist, Dr. Gordon LeGrand, to testify that fecal matter was found inside Stallings' vaginal area after her death.

During the sentencing proceeding, the State called Dr. LeGrand as an expert witness to describe Stallings' autopsy findings to the jury. Prior to Dr. LeGrand's testimony, defendant made a motion *in limine* to suppress any evidence related to fecal matter found inside Stallings' vagina. Defendant argued that this evidence was irrelevant to statutory aggravating circumstance (e)(9) and that any relevance was outweighed by its prejudicial effect on the jury. The trial court denied defendant's motion and held that "the State could bring out evidence of fecal material matter, that it was present, that a jury might consider that as it relates to any trauma or force or struggle or stress or anything else that she under if—as far as it being at the time of the killing."

Dr. LeGrand testified that fecal matter was found in Stallings' vagina about a "half inch or so beyond the actual vaginal entrance." He opined that the presence of fecal matter in Stallings' vagina was caused by a sudden, traumatic event such as the beating she

received by defendant or the gunshot wound to her head resulting in her death.

By failing to object at the time the State questioned Dr. LeGrand regarding the fecal matter, defendant waived this assignment of error. "In order to preserve a question for appellate review, a party must have presented to the trial court a timely request, objection or motion, stating the specific grounds for the ruling the party desired the court to make if the specific grounds were not apparent from the context." N.C. R. App. P. 10(b)(1). The trial court's denial of defendant's motion *in limine* is insufficient to preserve for appeal the question of the admissibility of the challenged evidence. *State v. Hayes*, 350 N.C. 79, 80, 511 S.E.2d 302, 303 (1999) (per curiam). We note that defendant failed to assign plain error to the trial court's admission of the challenged evidence. Accordingly, defendant's argument is not properly before this Court. *See* N.C. R. App. P. 10(c)(4); *State v. Frye*, 341 N.C. 470, 496, 461 S.E.2d 664, 677 (1995), *cert. denied*, 517 U.S. 1123, 134 L. Ed. 2d 526 (1996).

[6] In another assignment of error, defendant argues that the trial court erred by admitting hearsay testimony of Cecil Collins, a retired member of the Charlotte-Mecklenburg Police Department, who testified that defendant's wife, Cynthia McNeil (Cynthia), died as a result of defendant drowning her.

The State presented Collins' testimony to establish the existence of the (e)(3) statutory aggravating circumstance: "The defendant had been previously convicted of a felony involving the use or threat of violence to the person . . . ." N.C.G.S. § 15A-2000(e)(3). Collins testified that Cynthia's body was recovered from Lake Wylie on 13 July 1976 and, after making several untruthful statements, that defendant admitted to the police that he threw his wife's body over Buster Waters Bridge into Lake Wylie.

On cross-examination, defendant asked Collins:

Q. And the only thing anybody could ever determine with respect to the cause of death would be consistent with, with a drug overdose, isn't that true?

A. I can't answer that. I don't have the knowledge of that. I do know what was on the autopsy for, you know, cause of death, and beyond that after 20 years, I can't—I haven't seen it, so I don't recall.

On redirect by the State, the following colloquy occurred:

Q: Cause of death on the autopsy was drowning, wasn't it?

A: Yes, sir, it was.

By questioning Collins about the cause of Cynthia's death, defendant "opened the door" for the State to ask Collins similar or related questions. "The law 'wisely permits evidence not otherwise admissible to be offered to explain or rebut evidence elicited by the defendant himself.' " *State v. Warren*, 347 N.C. 309, 317, 492 S.E.2d 609, 613 (1997) (quoting *State v. Albert*, 303 N.C. 173, 177, 277 S.E.2d 439, 441 (1981)), *cert. denied*, 523 U.S. 1109, 140 L. Ed. 2d 818 (1998). "Where one party introduces evidence as to a particular fact or trans-action, the other party is entitled to introduce evidence in explana-tion or rebuttal thereof, even though such latter evidence would be incompetent or irrelevant had it been offered initially." *Albert*, 303 N.C. at 177, 277 S.E.2d at 441. Thus, by raising the issue of the cause of Cynthia's death on cross-examination, defendant "opened the door" for the State to elicit hearsay statements from Collins concern-ing the cause of her death in rebuttal.

Nevertheless, defendant argues that Collins' testimony was inad-missible hearsay under the Confrontation Clause of the Sixth Amendment to the United States Constitution and Article I, Sections 18, 19, 23, 24, and 27 of the North Carolina Constitution because Collins did not perform the autopsy and is reciting information devel-oped by someone else.

Even assuming that Collins' response in rebuttal to the line of questioning defendant initiated was barred by the Confrontation Clause, we conclude the trial court's admission of the challenged tes-timony was harmless beyond a reasonable doubt. Prior to Collins' testimony, the parties stipulated that defendant had pled guilty to vol-untary manslaughter for Cynthia's death and had received an active prison term for the offense. The State also introduced a certified copy of the criminal judgment and a copy of defendant's guilty plea for vol-untary manslaughter. Consequently, competent evidence of Cynthia's death was before the jury in the form of Collins' testimony, certified copies of defendant's voluntary manslaughter conviction, and defend-ant's guilty plea. This evidence adequately supports the trial court's submission of the (e)(3) statutory aggravating circumstance. *See State v. Richmond*, 347 N.C. 412, 437, 495 S.E.2d 677, 691 (where this court held that "error, if any, in the admission of [testimony of the

father of the victim regarding the cause of the victim's death] was harmless beyond a reasonable doubt because clearly competent evidence of defendant's first-degree murder conviction for this offense was admitted in the form of a certified copy of his criminal judgment"), *cert. denied*, —— U.S. ——, 142 L. Ed. 2d 88 (1998). Accordingly, any error in admitting the challenged testimony was harmless beyond a reasonable doubt.

**[7]** By defendant's next assignment of error, he contends the trial court should have submitted the (f)(1) statutory mitigating circumstance: "The defendant has no significant history of prior criminal activity." N.C.G.S. § 15A-2000(f)(1).

"The trial court is required to submit to the jury any statutory mitigating circumstance supported by the evidence regardless of whether the defendant objects to it or requests it." *State v. Bonnett*, 348 N.C. 417, 443, 502 S.E.2d 563, 580 (1998), *cert. denied*, —— U.S. ——, 142 L. Ed. 2d 907 (1999). Prior to submitting the (f)(1) statutory mitigating circumstance, "the trial court is required to determine whether a rational jury could conclude that defendant had no *significant* history of prior criminal activity." *State v. Wilson*, 322 N.C. 117, 143, 367 S.E.2d 589, 604 (1988). Defendant's prior criminal activity is considered "significant" under N.C.G.S. § 15A-2000(f)(1) if it is "likely to have influence or effect upon the determination by the jury of its recommended sentence." *State v. Walls*, 342 N.C. 1, 56, 463 S.E.2d 738, 767 (1995), *cert. denied*, 517 U.S. 1197, 134 L. Ed. 2d 794 (1996).

Defendant argues that *State v. McNeil*, 327 N.C. 388, 395 S.E.2d 106, the opinion issued by this Court after defendant's first trial, provides support for this assignment of error. In *McNeil* we noted, "we are unable to say beyond a reasonable doubt that no juror could reasonably have found that a defendant's commission of a single very serious noncapital crime years before was *not* a significant *history* of prior criminal activity." *Id.* at 395, 395 S.E.2d at 110-11. Nonetheless, during defendant's second sentencing hearing, the State, in addition to offering evidence of defendant's voluntary manslaughter conviction, also presented evidence of numerous other serious offenses committed by defendant which were not introduced during the first trial.

At the most recent sentencing proceeding, the State introduced evidence revealing defendant's 1959 conviction for house burglary where defendant was sentenced to six months probation in Washington, D.C. Defendant later violated this probation. Defendant

**STATE v. McNEIL**

[350 N.C. 657 (1999)]

served time in Savannah, Georgia, for larceny of a television. In 1975 defendant was arrested for hit-and-run and property damage. As discussed earlier, in 1977 defendant pled guilty to voluntary manslaughter for throwing his wife, Cynthia, over a bridge into Lake Wylie. This evidence of defendant's prior criminal activity is more extensive and significant than the evidence presented at defendant's first trial.

In support of his argument, defendant cites several cases where, under similar circumstances, he alleges this Court held it was appropriate to submit the (f)(1) statutory mitigating circumstance. *See Wilson*, 322 N.C. at 143, 367 S.E.2d at 604 (prior history included second-degree kidnaping conviction, theft, and storing illegal drugs); *State v. Lloyd*, 321 N.C. 301, 312, 364 S.E.2d 316, 324 (prior history included convictions of "assault with intent to rob not being armed," "breaking and entering a business place with intent to commit larceny," and alcohol-related misdemeanors), *sentence vacated on other grounds*, 488 U.S. 807, 102 L. Ed. 2d 18 (1988); *State v. Brown*, 315 N.C. 40, 62, 337 S.E.2d 808, 824 (1985) (prior history included felonious breaking and entering, felonious larceny, armed robbery, and felonious assault), *cert. denied*, 476 U.S. 1164, 90 L. Ed. 2d 733 (1986), *overruled on other grounds by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988). None of the cases defendant cites, however, involve a prior criminal history which includes a violent felony involving death, as is present in the instant case.

Consequently, the trial court properly found that no reasonable juror could have concluded that defendant's criminal history was insignificant under N.C.G.S. § 15A-2000(f)(1). Accordingly, this assignment of error is meritless.

In defendant's next assignment of error, he argues the trial court failed to intervene *ex mero motu* to preclude the prosecutor from making numerous improper statements to the jury during closing arguments. We disagree.

During the sentencing hearing, defendant failed to object to any portion of the prosecutor's closing argument. When a party fails to object during closing arguments, "the trial court is not required to intervene *ex mero motu* unless the argument strays so far from the bounds of propriety as to impede defendant's right to a fair trial." *Atkins*, 349 N.C. at 84, 505 S.E.2d at 111. Therefore, the appropriate standard of review for defendant's arguments is one of "gross impropriety." *State v. Green*, 336 N.C. 142, 188, 443 S.E.2d 14, 41, *cert. denied*, 513 U.S. 1046, 130 L. Ed. 2d 547 (1994).

"Trial counsel is allowed wide latitude in argument to the jury and may argue all of the evidence which has been presented as well as reasonable inferences which arise therefrom." *State v. Guevara*, 349 N.C. 243, 257, 506 S.E.2d 711, 721 (1998), *cert. denied*, —— U.S. ——, —— L. Ed. 2d ——, 67 U.S.L.W. 3716 (1999). "Whether counsel abuses this privilege is a matter ordinarily left to the sound discretion of the trial judge, and we will not review the exercise of this discretion unless there be such gross impropriety in the argument as would be likely to influence the verdict of the jury." *State v. Covington*, 290 N.C. 313, 328, 226 S.E.2d 629, 640 (1976).

[8] Defendant first argues that the prosecutor placed undue emphasis upon the personal qualities and future prospects of Stallings and Fore and sought to improperly invoke sympathy for the victims. The pertinent part of the prosecutor's closing argument included:

If you want to feel sympathy, you want to have some emotion in this case, if it's based on the evidence, that's okay. If it's rooted in the evidence, that's okay.

. . . .

. . . If you could ask Faye Stallings at this time would you want to work at a clothes house, I'll bet she'd say, yeah, I'll do that compared to where she is right now. Give Deborah Fore that chance, no question, living in a maximum facility, small, small cell, is that a bad life? It's not a good life. But is it enough punishment in this case based on what you've heard? No, it's not. It's absolutely flat out not enough, and there's no question about that.

Faye—do you think Faye and Deborah would trade for that? Of course they would. Do you think they would trade for the 13 years that they've been buried somewhere? Of course they would. Is life imprisonment enough? No, it is not.

In *State v. Larry*, 345 N.C. 497, 481 S.E.2d 907, *cert. denied*, —— U.S. ——, 139 L. Ed. 2d 234 (1997), this Court addressed a claim that the prosecutor's argument was improperly designed to appeal to the jury's sympathy for the victim. *Id.* at 529, 481 S.E.2d at 926. In rejecting defendant's claim, this Court stated:

[i]n *Payne v. Tennessee*, 501 U.S. 808, 825, 115 L. Ed. 2d 720, 735-36 (1991), the United States Supreme Court upheld the use of victim-impact statements during closing arguments

unless the victim-impact evidence is so unduly prejudicial that it renders the trial fundamentally unfair.

*State v. Bishop*, 343 N.C. [518,] 554, 472 S.E.2d [842,] 861 [(1996), *cert. denied*, 519 U.S. 1097, 136 L. Ed. 2d 723 (1997)]. In *State v. Bishop*, we held that the prosecutor's arguments about the victim and what she could have accomplished served to inform the jury about the specific harm caused by the crime and did not render the trial fundamentally unfair.

*Larry*, 345 N.C. at 529-30, 481 S.E.2d at 926.

In the instant case, the prosecutor's argument about the promising nature of Stallings' and Fore's lives served to inform the jury about the specific harm caused by defendant's crime. *See State v. Gregory*, 340 N.C. 365, 427, 459 S.E.2d 638, 674 (1995), *cert. denied*, 517 U.S. 1108, 134 L. Ed. 2d 478 (1996). Consequently, the prosecutor's argument was not so "grossly improper" as to require the trial court to intervene *ex mero motu.*

**[9]** Defendant next argues that the prosecutor's references to Cynthia's death as the third person killed urged the jury to return a death sentence based on the (e)(11) statutory aggravating circumstance, which the trial court refused to submit to the jury. N.C.G.S. § 15A-2000(e)(11) ("The murder for which the defendant stands convicted was part of a course of conduct . . . .").

Cynthia's death, however, was relevant to the (e)(3) statutory aggravating circumstance, and therefore, relevant to the decision of the jury. Accordingly, the prosecutor's statements relating to Cynthia's death did not constitute gross impropriety requiring intervention *ex mero motu* by the trial court. *See State v. Holden*, 321 N.C. 125, 156, 362 S.E.2d 513, 532 (1987) (prosecutor's statement, "How many more women are we going to have to see this man rape before we say enough is enough?" was not held to be so "grossly improper" as to require the trial court to intervene *ex mero motu*), *cert. denied*, 486 U.S. 1061, 100 L. Ed. 2d 935 (1988).

**[10]** Defendant further argues that the prosecutor's closing argument attempted to defend the imposition of the death penalty on general deterrence grounds. In his closing argument, the prosecutor stated:

The death penalty is a strong extreme measure, no question about it. It is proper in a civilized society. It is not society com-

mitting murder, it is the contrary. It is society protecting life. It is society making a statement that life is the proper thing. We're going to, we're going to enforce the laws and if you kill three people, that's enough. That is beyond enough. That's way beyond enough, and in this case, ladies and gentlemen, a decision of life imprisonment for the defendant is just not proper.

Defendant is correct in noting it is improper for the prosecutor to argue the "general deterrent" effect of capital punishment to the jury. *Bishop*, 343 N.C. at 555, 472 S.E.2d at 862; *State v. Hill*, 311 N.C. 465, 475, 319 S.E.2d 163, 169-170 (1984); *State v. Kirkley*, 308 N.C. 196, 215, 302 S.E.2d 144, 155 (1983), *overruled on other grounds by State v. Shank*, 322 N.C. 243, 367 S.E.2d 639 (1988). This Court, however, has approved prosecutorial arguments urging the jury to sentence a particular defendant to death to specifically deter that defendant from engaging in future murders. *See, e.g., State v. Locklear*, 349 N.C. 118, 164, 505 S.E.2d 277, 304 (1998), *cert. denied*, —— U.S. ——, 143 L. Ed. 2d 559 (1999).

Nonetheless, even assuming the prosecutor's statements were improper, they were not so "grossly improper" as to warrant action by the trial court *ex mero motu*. *Hill*, 311 N.C. at 475, 319 S.E.2d at 170 (prosecutor's argument referring to the "deterrent effect" of the death penalty did not warrant *ex mero motu* action by the court); *Kirkley*, 308 N.C. at 215, 302 S.E.2d at 155 (improper "general deterrent" argument by prosecutor was not grossly improper). Defendant's argument is without merit.

**[11]** Defendant also contends the prosecutor improperly informed the jury that community sentiment urged the death penalty and that the jury is effectively an arm of the State in the prosecution of defendant. The prosecutor argued:

Law enforcement has done all they can. We have done all we can. There comes a time in society, and this is the only real civic duty we have anymore, is serving on a jury. That you've got to stand up, you got to throw out your chest, you got to take on the oath and you've got to say, by gosh, I ain't standing for this anymore, this is not right, and it's not.

The State must not ask the jury " 'to lend an ear to the community rather than a voice.' " *State v. Scott*, 314 N.C. 309, 312, 333 S.E.2d 296, 298 (1985) (quoting *Prado v. State*, 626 S.W.2d 775, 776 (Tex. Crim. App. 1982)). It is not, however, improper to remind the jurors that

"they are the voice and conscience of the community." *State v. Brown*, 320 N.C. 179, 204, 358 S.E.2d 1, 18, *cert. denied*, 484 U.S. 970, 98 L. Ed. 2d 406 (1987).

We have held on several prior occasions that similar arguments advising jurors that law enforcement and the State can do no more are not prejudicial. *See State v. Barrett*, 343 N.C. 164, 180-81, 469 S.E.2d 888, 897 ("The buck stops here, ladies and gentlemen, and you cannot pass it along. It's in your laps. The police can't do anymore, the Judge can do no more. It's up to you to decide."), *cert. denied*, 519 U.S. 953, 136 L. Ed. 2d 259 (1996); *State v. Artis*, 325 N.C. 278, 329, 384 S.E.2d 470, 499 (1989) ("The officers can do no more. The State can do no more. The Judge can do no more. Now, it's entirely up to you. The eyes of Robeson County are on you. You speak for Robeson County . . . ."), *sentence vacated on other grounds*, 494 U.S. 1023, 108 L. Ed. 2d 604 (1990); *Brown*, 320 N.C. at 203, 358 S.E.2d at 18 ("The officers can't do any more. The State can't do any more. You speak for all the people of the State of North Carolina . . . .").

Accordingly, the prosecutor's comments were not "grossly improper," and thus, the trial court did not abuse its discretion in not intervening *ex mero motu*.

[12] Defendant next claims the prosecutor repeatedly urged the jury to reject proposed mitigating circumstances based upon defendant's failure to demonstrate he lacked moral culpability for the Stallings and Fore murders. Defendant contends that the prosecutor's argument improperly implied that the jury could ignore credible mitigating evidence concerning defendant's age, character, education, environment, habits, mentality, and prior record.

In the present case, the prosecutor's definition and statements concerning defendant's moral culpability are substantially similar to those found in the North Carolina pattern jury instructions. *See* N.C.P.I.—Crim. 150.10 (1996) (amended 1997). In any event, this Court has upheld virtually identical prosecutorial arguments in *State v. Bishop*, 343 N.C. 518, 552, 472 S.E.2d 842, 860 (1996), *cert. denied*, 519 U.S. 1097, 136 L. Ed. 2d 723 (1997), and *State v. McLaughlin*, 341 N.C. 426, 443-44, 462 S.E.2d 1, 10 (1995), *cert. denied*, 516 U.S. 1133, 133 L. Ed. 2d 879 (1996). Defendant's argument fails.

[13] Defendant further argues that the prosecutor improperly suggested to the jury that defendant took the victims' lives without due process. The prosecutor argued, "Where was due process? LeRoy

McNeil, he's her judge, jury, execut[ioner] all wrapped in one. Where is Faye Stallings' due process? Who was her advocate?" This Court has repeatedly held it is not improper to argue that defendant, as judge, jury, and executioner, single-handedly decided the victim's fate. *Hoffman*, 349 N.C. at 189, 505 S.E.2d at 93; *State v. Smith*, 347 N.C. 453, 466-67, 496 S.E.2d 357, 365, *cert. denied*, —— U.S. ——, 142 L. Ed. 2d 91 (1998); *Walls*, 342 N.C. at 64, 463 S.E.2d at 772. Defendant's argument is without merit.

**[14]** Defendant also contends that the prosecutor either materially misstated the evidence or based his arguments on facts not in evidence. Specifically, defendant contends the following arguments were improper: (1) that defendant did not rebut any evidence offered regarding Cynthia's death; and (2) that [defendant] "almost got away with [Fore's murder] but for good police work, but for the fact that they had fingerprints on file from the 1976 killing and were able to match them when they ran these prints found at the Stallings' murder scene and compared them and made that match."

"A jury argument is proper as long as it is consistent with the record and not based on conjecture or personal opinion." *Robinson*, 336 N.C. at 129, 443 S.E.2d at 331-32. "Counsel is permitted to argue from the evidence which has been presented, as well as reasonable inferences that can be drawn therefrom." *State v. McCollum*, 334 N.C. 208, 227, 433 S.E.2d 144, 154 (1993), *cert. denied*, 512 U.S. 1254, 129 L. Ed. 2d 895 (1994).

In the present case, the record reveals the State introduced, and defendant stipulated to, defendant's guilty plea of voluntary manslaughter for Cynthia's death in 1977. It can be reasonably inferred that defendant was fingerprinted after his arrest for this crime. It can also be reasonably inferred that law enforcement used defendant's fingerprints from their files in the investigation of the deaths of Stallings and Fore. Consequently, the prosecutor's comments were not grossly improper.

In any event, we note that the trial court properly instructed the jurors that they were the sole judge of the evidence and should be guided by their own recollection of the evidence, not counsel's arguments. *See State v. Call*, 349 N.C. 382, 420, 508 S.E.2d 496, 520 (1998). Jurors are presumed to follow the trial court's instructions. *State v. Jennings*, 333 N.C. 579, 618, 430 S.E.2d 188, 208, *cert. denied*, 510 U.S. 1028, 126 L. Ed. 2d 602 (1993). Accordingly, the trial court did not err in failing to intervene *ex mero motu*.

**STATE v. McNEIL**

[350 N.C. 657 (1999)]

**[15]** By defendant's next assignment of error, he argues that the trial court erroneously instructed the jury with respect to the (e)(3) statutory aggravating circumstance by reading the first bracketed sentence of N.C.P.I.—Crim. 150.10, which states, "voluntary manslaughter is by definition a felony involving the use or threat of violence to the person." Defendant contends the offense of voluntary manslaughter does not fall within this definition and the evidence does not show that Cynthia's death involved an inherently violent act.

To instruct the jury on the (e)(3) statutory aggravating circumstance, "the felony for which the defendant has been convicted must be one involving threat or use of violence to the person. It cannot, under this provision, be a crime against property." *State v. Goodman*, 298 N.C. 1, 23, 257 S.E.2d 569, 584 (1979). Voluntary manslaughter is defined as "the unlawful killing of a human being without malice, express or implied, and without premeditation and deliberation." *State v. Rinck*, 303 N.C. 551, 565, 280 S.E.2d 912, 923 (1981). "Generally, voluntary manslaughter occurs when one kills intentionally but does so in the heat of passion suddenly aroused by adequate provocation or in the exercise of self-defense where excessive force is utilized or the defendant is the aggressor." *State v. Barts*, 316 N.C. 666, 692, 343 S.E.2d 828, 845 (1986). Consequently, within the meaning and intent of N.C.G.S. § 15A-2000(e)(3), voluntary manslaughter is a felony involving the use or threat of violence to the person. Therefore, the trial court's instructions to the jury were proper.

**[16]** In a related assignment of error, defendant contends that the trial court improperly suggested, in charging the jury on the (e)(3) statutory aggravating circumstance, that defendant engaged in some acts of violence against Cynthia at or prior to her death. Defendant argues the trial court erred by instructing the jury as follows:

> If you find from the evidence beyond a reasonable doubt that the defendant had been convicted of voluntary manslaughter and that the defendant used violence to the, or threatened violence to the person in order to accomplish his criminal act, and that the defendant killed the victim after he had thrown her off of a bridge, you would find [the (e)(3)] aggravating circumstance and would so indicate by having your foreperson write "yes" in the space after this aggravating circumstance on the Issue and Recommendation form.

> If you do not so find or have a reasonable doubt as to one or more of these things, you will not find [the (e)(3)] aggravating

circumstance and will so indicate by having your foreperson write "no" in that space.

Defendant claims the trial court gave improper instructions concerning the circumstances under which the jury could find the (e)(3) statutory aggravating circumstance.

We note that defendant waived this argument by failing to properly object during the charge conference.

> A party may not assign as error any portion of the jury charge or omission therefrom unless he objects thereto before the jury retires to consider its verdict, stating distinctly that to which he objects and the grounds of his objection; provided, that opportunity was given to the party to make the objection out of the hearing of the jury, and, on request of any party, out of the presence of the jury.

N.C. R. App. P. 10(b)(2).

During the charge conference, defendant objected only to the trial court's reading of the first bracketed sentence of N.C.P.I.—Crim. 150.10. Defendant's objection was not directed to the circumstances under which the jury could find the (e)(3) statutory aggravating circumstance. Accordingly, defendant has waived appellate review of this assignment of error. N.C. R. App. P. 10(b)(2).

Nonetheless, defendant has assigned plain error to this alleged instructional error. *See* N.C. R. App. P. 10(c)(4). "In order to rise to the level of plain error, the error in the trial court's instructions must be so fundamental that (i) absent the error, the jury probably would have reached a different verdict; or (ii) the error would constitute a miscarriage of justice if not corrected." *State v. Holden*, 346 N.C. 404, 435, 488 S.E.2d 514, 531 (1997) (citing *State v. Collins*, 334 N.C. 54, 62, 431 S.E.2d 188, 193 (1993)), *cert. denied*, —— U.S. ——, 140 L. Ed. 2d 132 (1998).

The record shows, within the meaning and intent of the (e)(3) statutory aggravating circumstance, that defendant used violence or the threat of violence to throw Cynthia over a bridge into a lake while she was still alive. In accordance with the evidence presented, the trial court gave jury instructions that were substantially similar to those recommended in N.C.P.I.—Crim. 150.10. "Instructions determined by the trial judge to be warranted by the evidence shall be given by the court in its charge to the jury prior to its delibera-

tion . . . ." N.C.G.S. § 15A-2000(b). We conclude that the trial court's instructions did not constitute plain error and, accordingly, reject defendant's assignment of error.

[17] In his next assignment of error, defendant contends the trial court erred in its jury instruction concerning the (e)(9) statutory aggravating circumstance: "The capital felony was especially heinous, atrocious, or cruel." N.C.G.S. § 15A-2000(e)(9). Specifically, defendant argues that the trial court's instructions impermissibly allowed the jury to find the existence of the (e)(9) statutory aggravating circumstance for Stallings' murder based upon the combined actions of defendant and Penny.

Defendant relies on *Enmund v. Florida*, 458 U.S. 782, 73 L. Ed. 2d 1140 (1982), to assert that the statutory aggravating circumstances must focus on defendant's culpability and cannot include accomplice behavior. Defendant's reliance is misplaced. In discussing the holding of *Enmund* in *State v. Robinson*, 342 N.C. 74, 463 S.E.2d 218 (1995), *cert. denied*, 517 U.S. 1197, 134 L. Ed. 2d 793 (1996), this Court observed:

> [The United States Supreme Court in *Enmund*] held that the Eighth Amendment forbids the imposition of the death penalty on a defendant who aids and abets in the commission of a felony in the course of which a murder is committed by others, when the defendant does not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed. *Thus, an Enmund issue only arises when the State proceeds on a felony murder theory.*

*Id.* at 87, 463 S.E.2d at 226 (citation omitted) (emphasis added).

In *Enmund* there was no direct evidence showing that defendant either planned to murder the victim or was physically present when the killing occurred. *Enmund*, 458 U.S. at 786, 73 L. Ed. 2d 1144-45. In the present case, defendant admitted that he planned to kill Stallings so there would be no witnesses. Defendant further admitted shooting Stallings and in fact pled guilty to her murder. Accordingly, *Enmund* has no application to the facts at hand.

The trial court's instructions to the jury concerning the (e)(9) statutory aggravating circumstance were almost verbatim from the North Carolina pattern jury instructions. N.C.P.I.—Crim. 150.10. The trial court instructed:

Fourth. Was this murder especially heinous, atrocious or cruel? This aggravating circumstance is limited to acts done during the commission of the murder, but not after the death. In this context "heinous" means extremely wicked or shockingly evil. "Atrocious" means outrageous, wicked and vile. And "cruel" means designed to inflict a high degree of pain with utter indifference to or even enjoyment of the suffering of others. However, it is not enough that this murder be heinous, atrocious or cruel as those terms have just been defined to you. This murder must have been especially heinous, atrocious or cruel, and not every murder is especially so. For this murder to have been especially heinous, atrocious or cruel, any brutality which was involved in it must have exceeded that which is normally present in any killing, or this murder must have been a [conscienceless] or pitiless crime which was unnecessarily [torturous] to the victim.

This Court has upheld virtually identical jury instructions to those set out above in *State v. Syriani*, 333 N.C. 350, 390-91, 428 S.E.2d 118, 140-41, *cert. denied*, 510 U.S. 948, 126 L. Ed. 2d 341 (1993), and *State v. Lemons*, 348 N.C. 335, 370-71, 501 S.E.2d 309, 330-31 (1998), *sentence vacated on other grounds*, —— U.S. ——, —— L. Ed. 2d ——, 67 U.S.L.W. 3771 (1999). "Because these jury instructions incorporate narrowing definitions adopted by this Court and expressly approved by the United States Supreme Court, or are of the tenor of the definitions approved, we reaffirm that these instructions provide constitutionally sufficient guidance to the jury." *Syriani*, 333 N.C. at 391-92, 428 S.E.2d at 141.

[18] Nevertheless, defendant argues that these instructions impermissibly allowed the jury to find the (e)(9) statutory aggravating circumstance based on Penny's, not defendant's, behavior. "In determining whether the evidence is sufficient to support the trial court's submission of the especially heinous, atrocious, or cruel aggravator, we must consider the evidence 'in the light most favorable to the State, and the State is entitled to every reasonable inference to be drawn therefrom.' " *State v. Flippen*, 349 N.C. 264, 270, 506 S.E.2d 702, 706 (1998) (quoting *Lloyd*, 321 N.C. at 319, 364 S.E.2d at 328), *cert. denied*, —— U.S. ——, —— L. Ed. 2d ——, 67 U.S.L.W. 3716 (1999). "[C]ontradictions and discrepancies are for the jury to resolve; and all evidence admitted that is favorable to the State is to be considered." *Robinson*, 342 N.C. at 86, 463 S.E.2d at 225.

Whether the trial court properly submitted the (e)(9) statutory aggravating circumstance depends upon the particular facts of a

given case. *State v. Gibbs*, 335 N.C. 1, 61, 436 S.E.2d 321, 356 (1993), *cert. denied*, 512 U.S. 1246, 129 L. Ed. 2d 881 (1994). Defendant's capital offense must not be merely heinous, atrocious, or cruel; it must be especially heinous, atrocious, or cruel. *State v. Stanley*, 310 N.C. 332, 336, 312 S.E.2d 393, 396 (1984). "A murder is [especially] 'heinous, atrocious, or cruel' when it is a 'conscienceless or pitiless crime which is unnecessarily torturous to the victim.' " *State v. Rouse*, 339 N.C. 59, 97, 451 S.E.2d 543, 564 (1994) (quoting *Goodman*, 298 N.C. at 25, 257 S.E.2d at 585), *cert. denied*, 516 U.S. 832, 133 L. Ed. 2d 60 (1995). "The defendant's acts must be characterized by '*excessive* brutality, or physical pain, psychological suffering, or dehumanizing aspects *not normally present*' in a first degree murder case." *Stanley*, 310 N.C. at 336, 312 S.E.2d at 396 (quoting *State v. Blackwelder*, 309 N.C. 410, 414, 306 S.E.2d 783, 786 (1983)).

The evidence presented in this case, when considered in the light most favorable to the State, was sufficient to warrant the submission of the "especially heinous, atrocious, or cruel" statutory aggravating circumstance. The record reveals defendant tricked Stallings into a back bedroom of a vacant house by pretending to offer her drugs; defendant grabbed her around her neck, pulled out his knife, and asked for her money and food stamps; defendant had previously agreed to kill Stallings so there would be no witnesses; Stallings asked defendant and Penny if they were going to hurt her and then cried and begged for them not to do so; Stallings cooperated and gave them her food stamps; Stallings was cut on the chest and forced to lift her top to see if she had any money in her bra; defendant strangled Stallings until her eyes rolled back and her tongue came out of her mouth; and defendant shot Stallings in the head with an M1.22 rifle. The autopsy revealed that Stallings was severely beaten prior to her death and that she had a stab wound to her chest; a deep cut across the distal phalanx which extended to the bone described as a painful wound; a large premortem contusion above her left eye, with a corresponding linear abrasion below the eye caused by a narrow, blunt object; and a premortem blunt-trauma contusion of her liver. Defendant's fingerprints were found on a stick the pathologist testified could have caused the victim's contusions. Hair impressions consistent with Stallings' hair type were found on the other end of the stick. Defendant's bloody palm prints were found above the victim's body. There was blood on the bottom of Stallings' feet and barefoot impressions in the room.

The State's evidence clearly showed defendant murdered Stallings and was an active participant in severely beating and strangling her prior to her death. We therefore hold the evidence was sufficient to warrant the submission of the (e)(9) statutory aggravating circumstance in this case. *See McCollum*, 334 N.C. at 222, 433 S.E.2d at 151 (defendant's presence and active participation in the rape and murder of the victim justified submission of the (e)(9) statutory aggravating circumstance). This assignment of error is devoid of merit.

[19] In his next assignment of error, defendant contends the trial court improperly excluded evidence of his organic brain damage when instructing the jury on the (f)(2) statutory mitigating circumstance—"The capital felony was committed while the defendant was under the influence of mental or emotional disturbance"—and the (f)(6) statutory mitigating circumstance—"The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired." N.C.G.S. § 15A-2000(f)(2), (6).

At the charge conference, defendant requested submission of the (f)(2) and (f)(6) statutory mitigating circumstances. After agreeing to submit both of the statutory mitigating circumstances, the trial court asked defense counsel:

> COURT: Under number two, the contentions of the defendant as to that mitigating circumstances [sic], that the defendant suffered from alcoholism, as well as chronic alcoholism and personality disorder?
>
> MR. KINGSBERRY: Yeah, personality disorder and I can't—not otherwise specified.

Thereafter, the trial court instructed the jury in connection with the (f)(2) statutory mitigating circumstance as follows:

> You will find this mitigating circumstance if you find that the defendant suffered from chronic alcoholism or personality disorder not otherwise specified, and that as a result, the defendant was under the influence of mental or emotional disturbance when he killed the victim.

Similarly, the trial court instructed the jury regarding the (f)(6) statutory mitigating circumstance as follows:

You would find this mitigating circumstance if you find that the defendant was a chronic alcoholic or suffered from personality disorder not otherwise specified and that this impaired his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law.

After the trial court instructed the jury, and the jury had retired to begin its deliberations at the direction of the trial court, defendant raised the issue that organic brain damage should have been included as a third possibility under the (f)(2) and (f)(6) statutory mitigating circumstances. In response, the trial court stated, "I believe we had a discussion on that as to what was, those items were and I thought we did arrived [sic] at the evidence being chronic alcoholic and personality disorder."

The State argues that defendant waived this objection by failing to make a timely request to include evidence of organic brain damage when specifically asked by the trial court at the charge conference. We agree.

Rule 21 of the General Rules of Practice for the Superior and District Courts provides in pertinent part:

At the conclusion of the charge and before the jury begins its deliberations, and out of the hearing, or upon request, out of the presence of the jury, counsel shall be given the opportunity to object on the record to any portion of the charge, or omission therefrom, stating distinctly that to which he objects and the grounds of his objection.

Gen. R. Pract. Super. and Dist. Ct. 21, 1999 Ann. R. N.C. 16. Once the jury has been charged, however, defendant may only ask the trial court to correct or withdraw an erroneous instruction or to inform the jury on a point of law which should have been covered in the original instructions. *Id.*

Defendant's request following the trial court's charge did not fall within the provisions of Rule 21. Defendant asked the trial court to give new instructions to the jury regarding evidence of defendant's alleged organic brain damage. The record shows defendant did not ask for any such instruction during the charge conference. Once the jury has been charged, a defendant is not permitted under Rule 21 to propose a new evidentiary matter if he previously had the opportunity to raise any such argument at the charge conference. Accordingly, defendant has waived this assignment of error.

Moreover, as defendant did not assign plain error to challenge the alleged instructional error, the waiver rule precludes plain error review. *See* N.C. R. App. P. 10(c)(4); *Frye*, 341 N.C. at 496, 461 S.E.2d at 677.

## PRESERVATION

Defendant raises twenty additional issues which he concedes have been decided contrary to his position previously before this Court. Defendant makes these arguments for the purpose of permitting this Court to reexamine its prior holdings and also for the purpose of preserving these arguments for any possible further judicial review in this case. Specifically, defendant argues: (1) the trial court erred in denying defendant's motion to suppress his statement to investigating officers on 23 April 1983; (2) the trial court erred by imposing the death penalty upon defendant; (3) the trial court erred by denying defendant's motion to dismiss the cases against him on speedy-trial grounds; (4) the trial court erred by refusing to suppress all of the State's physical evidence against defendant; (5), (6), and (7) the trial court erred by refusing to allow defendant to question prospective jurors concerning their ability to consider sentencing defendant to life imprisonment, their ability to consider specific mitigating circumstances, and any misconceptions concerning the parole eligibility of persons sentenced to life imprisonment; (8) the trial court erred by denying defendant's motion for individual *voir dire* of prospective jurors; (9) the trial court erred by allowing the State's challenges for cause; (10) the trial court erred by allowing the State's peremptory challenge for prospective jurors who expressed reservations about imposition of capital punishment; (11) the trial court erred by refusing to allow defendant to argue the jury could consider the State's plea agreement with Penny as a mitigating circumstance; (12) defendant's trial counsel failed to give adequate representation by conceding the existence of statutory aggravating circumstances in his opening statement; (13), (14), (15), and (16) the trial court erred by submitting the (e)(3), (4), (5), and (9) statutory aggravating circumstances; (17) the trial court erred by failing to properly instruct the jury on the (e)(4) statutory aggravating circumstance; (18) the trial court erred by instructing the jury that before they could find the existence of a nonstatutory mitigating circumstance, they must first find that the circumstance has mitigating value; (19) the trial court erred in defining the term "mitigating circumstance"; and (20) the trial court erred by misstating the law in the jury charge.

We have considered defendant's arguments on these issues and find no compelling reason to depart from our prior holdings. Accordingly, defendant's assignments of error are without merit.

We note, however, that several of the issues that defendant has denominated as preservation issues cannot be determined solely by principles of law upon which this Court has previously ruled. Rather, these assignments of error are fact specific requiring review of the transcript and record to determine if they have merit. When counsel determines that an issue of this nature does not have merit, counsel should "omit it entirely from his or her argument on appeal." *State v. Barton*, 335 N.C. 696, 712, 441 S.E.2d 295, 303 (1994). Nevertheless, we have thoroughly reviewed the transcript and record as to these assignments of error and have determined they are meritless.

## PROPORTIONALITY REVIEW

[20] Having concluded that defendant's trial and capital sentencing proceeding were free of prejudicial error, we are required to review and determine: (1) whether the record supports the jury's finding of any aggravating circumstances upon which the sentencing court based its sentence of death; (2) whether the death sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor; and (3) whether the death sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. N.C.G.S. § 15A-2000(d)(2); *State v. LeGrande*, 346 N.C. 718, 727, 487 S.E.2d 727, 731 (1997); *State v. Rich*, 346 N.C. 50, 66, 484 S.E.2d 394, 404 (1997).

In the present case, defendant pled guilty to the first-degree murders of Stallings and Fore. The jury found four aggravating circumstances in the Stallings murder: (1) defendant had been previously convicted of a felony involving the threat of violence to the person, N.C.G.S. § 15A-2000(e)(3); (2) the murder was committed for the purpose of avoiding or preventing a lawful arrest, N.C.G.S. § 15A-2000(e)(4); (3) the murder was committed while defendant was engaged in the commission of robbery with a dangerous weapon, N.C.G.S. § 15A-2000(e)(5); and (4) the murder was especially heinous, atrocious, or cruel, N.C.G.S. § 15A-2000(e)(9). The jury found three aggravating circumstances in the Fore murder: (1) defendant had been previously convicted of a felony involving the threat of violence to the person, N.C.G.S. § 15A-2000(e)(3); (2) the murder was committed for the purpose of avoiding or preventing a lawful arrest, N.C.G.S. § 15A-2000(e)(4); and (3) the murder was committed while

STATE v. McNEIL

[350 N.C. 657 (1999)]

defendant was engaged in the commission of robbery with a dangerous weapon, N.C.G.S. § 15A-2000(e)(5).

Of the twelve mitigating circumstances submitted for the Stallings murder, one or more jurors found the following: (1) the murder was committed while defendant was under the influence of mental or emotional disturbance, N.C.G.S. § 15A-2000(f)(2); (2) defendant was born into a home environment of fear, violence, and abuse; (3) defendant was exposed to alcohol consumption and dependency at an early age; (4) during the thirteen years since these events occurred defendant has changed from the person he was in 1983, as seen in part by his demeanor toward prison staff and fellow inmates; (5) defendant volunteers for extra work, without pay, and accepts any task, no matter how menial; and (6) other circumstances found by the jury deemed to have mitigating value, N.C.G.S. § 15A-2000(f)(9). Of the twelve mitigating circumstances submitted for the Fore murder, one or more jurors found the same six mitigating circumstances described above, as well as a seventh mitigating circumstance, that defendant never knew his father and was abandoned by his mother.

After thoroughly examining the records, transcripts, and briefs in this case, we conclude the evidence fully supports the aggravating circumstances found by the jury. Further, there is no indication that the death sentence was imposed under the influence of passion, prejudice, or any other arbitrary consideration. We turn then to our final statutory duty of proportionality review.

[21] In conducting our proportionality review, it is proper to compare the present case with other cases in which this Court has concluded the death penalty was disproportionate. *McCollum*, 334 N.C. at 240, 433 S.E.2d at 162. The purpose of proportionality review is to "eliminate the possibility that a person will be sentenced to die by the action of an aberrant jury." *Holden*, 321 N.C. at 164-65, 362 S.E.2d at 537. We have found the death penalty disproportionate in seven cases. *State v. Benson*, 323 N.C. 318, 372 S.E.2d 517 (1988); *State v. Stokes*, 319 N.C. 1, 352 S.E.2d 653 (1987); *State v. Rogers*, 316 N.C. 203, 341 S.E.2d 713 (1986), *overruled on other grounds by State v. Gaines*, 345 N.C. 647, 483 S.E.2d 396, *cert. denied*, 522 U.S. 900, 139 L. Ed. 2d 177 (1997), *and by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988); *State v. Young*, 312 N.C. 669, 325 S.E.2d 181 (1985); *State v. Hill*, 311 N.C. 465, 319 S.E.2d 163 (1984); *State v. Bondurant*, 309 N.C. 674, 309 S.E.2d 170 (1983); *State v. Jackson*, 309 N.C. 26, 305 S.E.2d 703 (1983).

We conclude that this case is not substantially similar to any of the aforementioned cases in which this Court has found the death penalty disproportionate. The instant case is distinguishable in the following ways: (1) defendant admitted murdering two victims; (2) defendant pled guilty to the premeditated and deliberate first-degree murder of both victims; (3) defendant planned to rob and kill Stallings, deceived her to get her alone in a vacant house, then brutally tortured and murdered her; (4) two days later, defendant planned to rob and kill Fore, lured her to go drinking, drove her to an isolated area, then shot her in the head and left her body on the side of the road; (5) after shooting Fore, defendant went to her apartment and stole several of her belongings; (6) the jury found four statutory aggravating circumstances against defendant in the Stallings murder; and (7) the jury found three statutory aggravating circumstances against defendant in the Fore murder. Accordingly, the facts and circumstances distinguish the instant case from those in which this Court held the death penalty disproportionate.

We also compare the present case with cases in which this Court has found the death penalty to be proportionate. Although we review all of the cases in the pool of "similar cases" when engaging in our statutorily mandated duty of proportionality, it is unnecessary to discuss or cite all of these cases for comparison. *State v. Gregory*, 348 N.C. 203, 213, 499 S.E.2d 753, 760, *cert. denied*, —— U.S. ——, 142 L. Ed. 2d 315 (1998); *McCollum*, 334 N.C. at 244, 433 S.E.2d at 164; *State v. Williams*, 308 N.C. 47, 81, 301 S.E.2d 335, 355, *cert. denied*, 464 U.S. 865, 78 L. Ed. 2d 177 (1983).

As discussed earlier, defendant pled guilty to two first-degree murders. This Court has never found a death sentence disproportionate where defendant was convicted of murdering more than one victim. *See, e.g., State v. Warren*, 348 N.C. 80, 129, 499 S.E.2d 431, 459, *cert. denied*, —— U.S. ——, 142 L. Ed. 2d 216 (1998); *State v. Heatwole*, 344 N.C. 1, 30, 473 S.E.2d 310, 325 (1996), *cert. denied*, 520 U.S. 1122, 137 L. Ed. 2d 339 (1997); *McLaughlin*, 341 N.C. at 466, 462 S.E.2d at 23; *see also Brown*, 320 N.C. at 210, 358 S.E.2d at 22 (plea of guilty is the equivalent of conviction).

Further, of the four statutory aggravating circumstances found by the jury in the Stallings murder, three, standing alone, have been found sufficient to sustain a death sentence: (1) the (e)(3) statutory aggravating circumstance, *see Brown*, 320 N.C. at 219, 358 S.E.2d at 27; (2) the (e)(5) statutory aggravating circumstance, *see State v. Zuniga*, 320 N.C. 233, 274-76, 357 S.E.2d 898, 923-24, *cert. denied*, 484

U.S. 959, 98 L. Ed. 2d 384 (1987); and (3) the (e)(9) statutory aggravating circumstance, see Syriani, 333 N.C. at 400-06, 428 S.E.2d at 144-49. In the Fore murder, of the three statutory aggravating circumstances found, two, standing alone, have been found sufficient to sustain a death sentence: (1) the (e)(3) statutory aggravating circumstance, see Brown, 320 N.C. at 219, 358 S.E.2d at 27; and (2) the (e)(5) statutory aggravating circumstance, see Zuniga, 320 N.C. at 274-76, 357 S.E.2d at 923-24.

The remaining aggravating circumstance in both murders was the (e)(4) statutory aggravating circumstance (witness elimination). "[This Court has] never found a death sentence to be disproportionate in a witness-elimination case. The reason is clear: '[m]urder can be motivated by emotions such as greed, jealousy, hate, revenge, or passion. The motive of witness elimination lacks even the excuse of emotion.' " State v. McCarver, 341 N.C. 364, 407, 462 S.E.2d 25, 49 (1995) (quoting State v. Oliver, 309 N.C. 326, 375, 307 S.E.2d 304, 335 (1983)), cert. denied, 517 U.S. 1110, 134 L. Ed. 2d 482 (1996).

After comparing this case to "similar cases" as to the crime and defendant, we conclude that this case has the characteristics of first-degree murders for which we have previously upheld the death penalty as proportionate. Accordingly, we cannot say defendant's death sentence is excessive or disproportionate.

NO ERROR.